BUCHANAN HOME AND AUTO SUPPLY CO., INC., Plaintiff,

v.

FIRESTONE TIRE AND RUBBER COMPANY, Defendant.

Civ. A. No. 79-175-9.

United States District Court, D. South Carolina, Aiken Division.

July 7, 1981.

Terry E. Richardson, Jr., Thomas E. Weeks, Barnwell, S.C., J. Kendall Few, Greenville, S.C., for plaintiff.

James M. Brailsford, III, Columbia, S.C., for defendant.

## ORDER

CHAPMAN, District Judge.

This matter is before the Court upon motion to dismiss the complaint because of fraudulent, dishonest and illegal conduct by Robert Buchanan, Sr. and Barry Buchanan. The conduct was undertaken by the Buchanans on behalf of the corporate plaintiff in this action, Buchanan Home and Auto Supply Company. The matter is submitted to the Court upon the pleadings, the defendant's requests to admit and plaintiff's responses thereto, the depositions of Robert Buchanan, Sr., Barry Buchanan and Clinnie R. Bach, and the affidavit of Robert C. Weber. The material facts of the Buchanans' fraudulent and dishonest course of dealing with the defendant in this action Firestone Tire and Rubber Company (hereafter "Firestone") are not in dispute.

At all times relevant to plaintiff's claims, Buchanan Home and Auto Supply Company was an authorized retail Firestone dealer in Aiken, South Carolina. Until the Aiken company's status as a Firestone retailer ceased in February of 1977, it carried and sold a line of Firestone automobile tires, including Firestone 500 steel belted radial

tires. The company allegedly experienced much customer dissatisfaction with defective Firestone 500 steel belted radials. The complaint alleges that this dissatisfaction resulted in a loss of plaintiff's customer goodwill and other undue expenses in connection with handling unsatisfactory Firestone 500 radials.

Buchanan Home and Auto Supply Company commenced this action against Firestone, the manufacturer and distributor of Firestone 500 steel belted radials, on January 26, 1979. The complaint alleges causes of action for breach of warranty of merchantability, breach of contract, negligent manufacture, strict liability, breach of contract accompanied by fraudulent act, and misrepresentation. On November 29, 1979, the Court [1] dismissed the negligent manufacture and strict liability causes of action without opposition from plaintiff and denied the defendant's motion to dismiss the other causes of action in the complaint.

One of the obligations plaintiff undertook as an authorized Firestone dealer was to "replace and adjust" Firestone automobile tires that became unserviceable while under warranty. This obligation meant that when plaintiff determined that a Firestone tire owner presented a valid warranty claim to it, plaintiff was obligated to replace the unsatisfactory Firestone tire with a new Firestone tire. The new tire normally came from the inventory on hand at the store. The customer was charged an amount for the new tire based on the treadwear already received from the customer's original tire. This process is referred to in the automobile tire industry as "replacement and adjustment" of unserviceable tires.

Firestone paid plaintiff a handling fee for each tire replaced and adjusted. Plaintiff also received a billing credit from Firestone for each tire taken from its inventory and used in the replacement and adjustment process. The amount of the billing credit plaintiff received was dependent on the adjusted amount the consumer paid for the replacement tire.

1. Hon. Charles E. Simons, Jr.

Firestone paid dealers the handling fee to reimburse them for the cost of time spent replacing and adjusting unserviceable Firestone tires. Firestone applied a billing credit to the account of dealers replacing unserviceable tires to reimburse the dealers for the cost of the replacement tire taken from the dealers inventory. Neither plaintiff, nor other Firestone dealers agreeing to replace and adjust unserviceable Firestone tires, were to receive a profit from participation in the replacement and adjustment process.

The essence of plaintiff's claim in this action is that it was required to replace and adjust so many Firestone 500 radial tires, it incurred undue handling expenses that were not reimbursed, it made no profit on the new tires being furnished as replacements, and it suffered a loss of goodwill as a result of its association with the Firestone name. Plaintiff seeks monetary damages for these alleged injuries.

To receive a handling fee and billing credit from Firestone, plaintiff was required to return the replaced tire to Firestone along with an adjustment form signed by the consumer. The adjustment form was designed to protect Firestone from dealers or consumers that would abuse the adjustment process. The adjustment form required the tire owner's name and address, the date of the adjustment, treadwear on the replaced tire, type of tire replaced, and price paid by the consumer for the new tire. The form was to be signed by the consumer and submitted to Firestone with the replaced tire. At all times relevant to this action, plaintiff was fully aware of these requirements.

The depositions, requests to admit and affidavit presently before the Court indicates that Robert Buchanan, Sr. and Barry Buchanan, as principals of plaintiff, were engaged in a scheme to defraud Firestone by submitting to it forged or otherwise falsified adjustment forms. Plaintiff has admitted that approximately 600 adjustment forms it submitted to Firestone over a

period of three years were forged or otherwise falsified. Each fraudulent adjustment form was worth a substantial sum to plaintiff, $40.00 to $50.00 each according to Robert Buchanan, Sr.

Most of the forging and selection of false information was done at night after regular business hours. Robert Buchanan, Sr. forged most of the forms himself, but he also elicited the help of Barry Buchanan and a few other employees so that the style of the signatures would be varied and less likely to be detected as a forgery. Dummy names were obtained from plaintiff's credit files, the phone book and the city directory.

The fraud committed by plaintiff was not limited to falsifying and forging adjustment forms.[2] Both Robert Buchanan, Sr. and Barry Buchanan knew that to be entitled to adjustment fees and credits, plaintiff was obligated to replace an adjusted Firestone tire with a new Firestone tire. Robert Buchanan, Sr., however, has admitted filing adjustment forms to receive the fees and credits when the replacement tire was manufactured by one of Firestone's competitors.

Many courts have held that a civil claim for damages may be dismissed when the party asserting the claim is guilty of fraud or some other act of bad faith closely relating to the matter being asserted. The authority to dismiss a claim under these circumstances arises from the Court's fundamental authority to protect its own integrity and the integrity of the judicial process.

The authority to dismiss a claim for the protection of the integrity of the court was thoroughly developed by courts of equity through the equitable maxim of clean hands. As stated in *Mas v. Coca-Cola*, 163 F.2d 505, 507–508 (4th Cir. 1947):

> The clean hands doctrine is one which the court applies, not for the protection of the parties, but for its own protection. Its basis was well stated by Professor Pomeroy (Equity Jurisprudence, 4th Ed., sec. 397) as follows: "It assumes that the

---

**2.** In addition to fraud in connection with the adjustment process, Firestone has established

that plaintiff falsified financial statements and tax returns to conceal its non-profitability.

suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him *all* recognition and relief with reference to the subject-matter or transaction in question. It says that whenever a party, who, as *actor* seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy."

As the above quotation indicates, the clean hands maxim ("He who comes into equity must come with clean hands") is a discretionary defense signifying the chancellor's traditional authority to refuse to grant equitable relief to a petitioner with "unclean hands". Unclean hands results from fraud or other inequitable conduct by the petitioner which so closely relates to the claim being asserted that it would be improper to permit the petitioner to prosecute the claim in a court of equity.

Until recently it was thought that the clean hands defense was available only in equitable actions, and that there was no comparable broad-based grounds for dismissing legal actions for damages. For example, in *Carman v. Fox Film Corp.*, 269 F. 928 (2d Cir. 1920), reversing 258 F. 703 (S.D.N.Y.1919) and *Carmen v. Fox Film Corp.*, 204 App.Div. 776, 198 N.Y.S. 766 (1923), the plaintiff was initially denied the right to sue in equity for an injunction and damages, but subsequently was allowed to recover a verdict at law for damages on the same claim. See also Dobbs, *Handbook on the Law of Remedies*, § 2.4 at p. 46 (1973).

Court opinions and commentaries since the procedural merger of law and equity in 1938 have expressed the view that the clean hands doctrine embodies a general principle equally applicable to damage actions,[3] and that rights not suited for protection at equity should not be protected at law.[4] The decision in *Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507 (4th Cir. 1969), indicates that the Fourth Circuit is willing to apply the principle underlying the clean hands doctrine as a defense to certain actions for damages. In *Tempo* the Court relied on what it designated "an application of the ancient equitable doctrine of clean hands," to estop the plaintiff from recovering an injunction and damages in an otherwise meritorious copyright infringement suit. The Court justified application of the clean hands principle to the damages portion of the suit by stating that principles of equitable estoppel would apply to deny the plaintiff its right to plead and prove the copyright infringement.

■ Whether designated as the principle underlying clean hands or as equitable estoppel, the defense applied in *Tempo* is equally applicable in the instant case where it would be grossly inequitable to allow plaintiff to recover. The essence of plaintiff's cause of action is based on evidence which it admits having forged and falsified for its own benefit. The requests to admit and deposition testimony before the Court are susceptible of only one reasonable inference—that plaintiff undertook and was at least initially successful in a scheme to defraud thousands of dollars of billing credits and handling fees from plaintiff. This Court finds it impossible to believe that the forgery and falsification by the Buchanans resulted from a shortage of blank adjustment forms as the Buchanans now assert. Plaintiff admits that the correct information was collected in every instance on forms required by the United States De-

**3.** *Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507 (4th Cir. 1969); *Kuehert v. Texstar Corp.*, 412 F.2d 700, 704 (5th Cir. 1969); *Mallis v. Bankers Trust Co.*, 615 F.2d 68 (2nd Cir. 1980); *Union Pacific Railroad Company v. Chicago & North Western Railway Company*, 226 F.Supp. 400, 410 (D.Utah 1964); Stevens, *A Plea for the Extension of Equitable Principles and Remedies*, 41 CORN.L.Q. 351 (1956); and Garvey, *Merger of Law and Equity*, 10 CATH.U.Rev. 59 (1961).

**4.** CHAFEE, SOME PROBLEMS OF EQUITY 29 (1950).

partment of Transportation and on work orders filled out as a matter of company practice. There can be no explanation (short of intent to defraud) for resort to phone books and credit records when correct information was available to plaintiff.

In addition, plaintiff's conduct would be inexcusable even in the absence of readily available and accurate information about the adjustments. Plaintiff had a contractual as well as moral duty to maintain and keep accurate records of the replacements and adjustments it made and also to obtain the signatures of customers receiving adjustments. It would be inequitable to allow plaintiff to attempt to prove its threadbare avoidance premised on a shortage of adjustment forms at this time. For Firestone the obvious and only response to the avoidance is to prove that plaintiff did not actually make a corresponding adjustment for each fraudulent adjustment form submitted. The means of offering this proof has been effectively precluded by plaintiff since it is conveniently unable to locate any accurate information about actual adjustment recipients. Robert Buchanan, Sr., himself admitted that he could think of "no way" in which anyone could sort out his phony adjustment forms. Plaintiff filed falsified and forged adjustment forms and breached its duty to maintain accurate information about the adjustments made. Since Firestone is now prevented from cross-checking these forged and falsified adjustment forms because of plaintiff's failure to collect and maintain accurate information about the adjustments, plaintiff should be estopped from an avoidance based on claimed "actual" adjustments that cannot now be documented or cross-checked.

The Buchanans' fraudulent and dishonest conduct lies at the heart of claims by Buchanan Home and Auto Supply Company. The essence of plaintiff's claims in this lawsuit is that it did not receive sufficient compensation for replacing and adjusting unserviceable Firestone 500 radial tires and that so many of the Firestone tires had to be replaced that association with the Firestone name adversely affected customer goodwill toward plaintiff. Essential to re-covery on all of plaintiff's claims is a determination of the number of legitimate warranty claims plaintiff had to process. The plaintiff's fraud discussed above hopelessly obscures any possibility of accurately resolving this question. The clincher with respect to plaintiff's claim for loss of good will resulting from association with the Firestone name and its products is that plaintiff continued to prominently display a Firestone sign and otherwise use the Firestone name and logo for more than two years after plaintiff ceased to be an authorized dealer.

■ Plaintiff also asserts that the forged and falsified adjustment forms were completed with the knowledge and encouragement of defendant, through its agent John Welch. If Welch in fact did encourage the Buchanans to file fraudulent adjustment forms, such encouragement was received by the Buchanans with full knowledge that Firestone did not and would not approve of such adjustment credits.

Immediately prior to the time Robert Buchanan, Sr. admits beginning to forge and falsify adjustment forms, Welch had attempted to intercede on behalf of plaintiff with the Firestone office handling adjustment credits and fees. Welch attempted and was successful in getting the office to accept approximately 55 unsigned adjustment forms from Buchanan Home and Auto Supply Company. Upon agreeing to accept the 55 unsigned adjustment forms, the office made it clear to Robert Buchanan, Sr. that no more unsigned adjustment forms would be accepted and that all future forms must be signed and correctly completed.

It is at this point that Robert Buchanan, Sr. admits beginning to forge and falsify adjustment forms. He admits filing them knowing that Firestone would not act on the adjustment forms if it knew that they were forged or otherwise falsified. As the senior Buchanan admitted in his deposition:

Q. Now what is it, Mr. Buchanan, that has jarred your recollection and has created a situation where a few min-

utes ago you were telling me you just couldn't estimate it, you just couldn't ballpark it. Now you know it happened right after that initial set of printed adjustment tickets with the name printed instead of the signature. What is it that has caused your memory—

MR. WEEKS: The repetitious questioning.

MR. STRUACH: What is it? I asked him, Tommy, not you. Bear in mind if I start asking this man questions over and over again that his recollection does change and the testimony changes if he's asked the question a lot. Go ahead.

A. When I said immediately, I mean that as soon as they called me and told me that they couldn't accept the forms without the signatures.

Q. All right. Now when was that?

A. That would have been probably two weeks after we sent them in—two to three weeks after we sent them in.

Q. After you sent the adjustment tickets in that were printed.

A. Right.

Q. All right. Now did you then begin using phony names and forging names to these adjustment tickets because you knew that if there wasn't a signature, you weren't going to get adjustment credit—

A. Weren't going to get the credit. We were running close and needed the credits as fast as we could get them.

Q. Now I thought you testified earlier that Welch did get through for you—

A. He did.

Q. Adjustment credits without signatures.

A. He did.

Q. And that came through something like sixty days after you had sent them in.

A. Sixty to ninety days.

Q. Sixty to ninety days. All right. Now at that point in time, you knew that you had gotten adjustment credit for that, didn't you?

A. Yes.

Q. Without having to forge signatures or make up names, didn't you?

A. Yes.

Q. Now did you at that point in time stop using phony names and stop forging adjustment tickets?

A. No, because they had told us they wouldn't accept any more that way. (Robert Buchanan Dep. at 708–710).

The plaintiff's allegations that Welch encouraged the Buchanans to file fraudulent adjustment forms are at best an unsubstantiated claim that Welch was acting *in pari delicto* with the Buchanans. Since Firestone's position that the forms must be signed by the customer was admittedly clear to all the parties involved, the disloyal actions of Welch, if he in fact was guilty of any, should not be vicariously attributed to Firestone.

Plaintiff also asserts that in applying the clean hands doctrine to this claim, the Court should balance the respective misconduct of the two parties. Since the clean hands principle is being applied in this action to protect the integrity of the courts and the judicial process, a balancing of the respective misconduct is not necessary. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945); *Mas v. Coca-Cola, supra* at 510.

As stated in *Mas v. Coca-Cola*:

No court of equity [or court of law in this instance] ought to listen to a man whose very presence suggests danger to the administration of justice and whose past conduct affecting the matter in litigation would cast doubt upon the ability of the court to ascertain from him the truth with respect thereto. *Id.* at 511.

The Buchanans' presence in the courtroom in this action suggests danger to the administration of justice. For this reason and for the above stated reasons, the defendant's motion to dismiss the complaint is granted.

AND IT IS SO ORDERED.