CORRIGAN, J.
In this case we consider the essential authority of trial courts to control the proceedings before them. The issue in this case pertains to the extent of a trial court’s authority to govern the conduct of counsel and their clients in court proceedings. Where the Michigan Constitution authorizes us to make rules to govern court proceedings, the authority to enforce those rules inescapably follows. At the heart of preserving an organized polity, we must attend to relevant issues, including concerns over belligerent, antagonistic, or incompetent lawyering. To this end, we affirm the authority of trial courts to impose sanctions appropriate to contain and prevent abuses so as to ensure the orderly operation of justice.
*376 We reiterate that trial courts possess the inherent authority to sanction litigants and their counsel, including the power to dismiss an action. Banta v Serban, 370 Mich 367, 368; 121 NW2d 854 (1963); Persichini v Beaumont Hosp, 238 Mich App 626, 639-640; 607 NW2d 100 (1999); Prince v MacDonald, 237 Mich App 186, 189; 602 NW2d 834 (1999). This power is not governed so much by rule or statute, but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. See Chambers v NASCO, Inc, 501 US 32, 43; 111 S Ct 2123; 115 L Ed 2d 27 (1991).
We further acknowledge that our trial courts also have express authority to direct and control the proceedings before them. MCL 600.611 provides that “[cjircuit courts have jurisdiction and power to make any order proper to fully effectuate the circuit courts’ jurisdiction and judgments.” Additionally, MCR 2.504(B)(1) provides that “[i]f the plaintiff fails to comply with these rules or a court order, a defendant may move for dismissal of an action or a claim against that defendant.”
In the instant case, we consider whether the trial court abused its discretion in dismissing plaintiffs case because plaintiff and her attorneys repeatedly and intentionally publicized inadmissible evidence so as to taint the potential jury pool, deny defendants a fair trial, and frustrate the due administration of justice. We conclude that because the trial court possessed the inherent authority to dismiss the action, and because the trial court warned plaintiff and her counsel that dismissal would result if they continued to publicize evidence ruled inadmissible by court order, the trial court did not abuse its discretion in dismissing plaintiffs case.
*377 We also consider whether the trial court’s dismissal of plaintiffs case because plaintiff intentionally disobeyed its explicit warning to refrain from publicizing information regarding defendant Daniel E Bennett’s excluded conviction violated the First Amendment. The trial court’s limitation on the speech of plaintiff and her counsel was a narrow and necessary limitation aimed at protecting potential jurors from prejudice. See Gentile v State Bar of Nevada, 501 US 1030; 111 S Ct 2720; 115 L Ed 2d 888 (1991). The trial court’s narrow restriction on speech did not offend the First Amendment. The Court of Appeals novel requirement that dismissal is improper unless the jury pool was actually tainted conflicts with the substantial likelihood of prejudice test of Gentile. Moreover, “actual taint” is an impossible and unworkable standard, especially where nearly three years have passed since the incidents occurred. Accordingly, we reverse the judgment of the Court of Appeals and reinstate the trial court’s order dismissing plaintiffs complaint.
I. UNDERLYING PACTS AND PROCEDURAL HISTORY
Flaintiff Justine Maldonado, an employee of defendant Ford Motor Company, filed suit against Ford, alleging that a Ford supervisor, Daniel Bennett, sexually harassed her in violation of the Michigan Civil Rights Act (CRA), MCL 37.2101 et seq.[1] Ford (hereafter defendant) moved in limine to exclude evidence of Bennett’s 1995 indecent exposure conviction. Judge Kathleen Macdonald, the original judge assigned to the case, granted defendant’s motion and entered an order *378 on February 16, 2001, excluding evidence of Bennett’s prior conviction in this case and in another action brought against Bennett, Elezovic v Ford Motor Co, 472 Mich 408; 697 NW2d 851 (2005).[2] Plaintiff thereafter sought leave to appeal to the Court of Appeals and this Court regarding Judge Macdonald’s decision to exclude Bennett’s prior conviction. Both the Court of Appeals and this Court denied plaintiffs application.[3]
On September 11, 2001, less than a month before a settlement conference scheduled for October 3, 2001, and shortly after a three-week trial resulting in a directed verdict for defendants in the Elezovic case, plaintiffs counsel issued a press release on firm letterhead that referred to Bennett’s indecent exposure conviction, Judge Macdonald’s exclusion of that conviction as evidence, and the impending trial in this case.[4] A *379 series of news broadcasts and print media publications followed, replete with references to Bennett’s prior conviction.[5]
On November 9, 2001, Bennett’s indecent exposure conviction was expunged in district court proceedings.
By order dated January 11, 2002, Judge Macdonald established a trial date of July 8, 2002.
In February 2002, Judge Macdonald was assigned to the family division of the circuit court. Consequently, this case was reassigned by lot to Judge William Giovan. On May 17, 2002, Judge Giovan held a hearing regarding the admissibility of propensity evidence not currently at issue. Plaintiffs counsel invited the media to this hearing. Despite Judge Giovan’s order closing the hearing to the media,, plaintiffs counsel directed the *380 media to wait outside until the hearing concluded to discuss details regarding the hearing.
Immediately following the hearing, Judge Giovan met with all counsel to discuss plaintiffs counsel’s continued public references to Bennett’s prior conviction despite Judge Macdonald’s previous court order and the expungement of the conviction. Bennett’s counsel pointed out that plaintiffs counsel’s behavior apparently violated MCL 780.623(5),[6] which criminalizes the divulgence, use, or publication of information regarding an expunged conviction. Plaintiffs counsel responded by stating that “it was worth the risk” to continue to publicize Bennett’s expunged conviction.[7]
Judge Giovan declined to order plaintiffs counsel to obey MCL 780.623(5) because he considered it redundant to order an attorney to follow the law.[8] Despite *381 Judge Giovan’s expression of confidence that counsel would follow the law, plaintiffs counsel left the courtroom and met with the waiting media. This meeting resulted in extensive television news and press coverage, some of which again referred to Bennett’s expunged conviction and the possible exclusion of the propensity evidence.[9] Shortly thereafter, plaintiffs counsel again discussed this case at a May 28 public meeting and a June 1, 2002, rally in Ann Arbor sponsored by BAMN (Coalition to Defend Affirmative Action, Integration & Immigrant Rights and Fight for Equality by any Means Necessary).[10]
Plaintiff subsequently moved to dissolve Judge Macdonald’s order excluding Bennett’s prior conviction from evidence. On June 13 and 21, 2002, Judge Giovan heard the motion. During that hearing, plaintiffs counsel mentioned that an article had been published in the June 12-18, 2002, issue of the Metro-Times, a free weekly publication readily available in the courthouse where jury selection was imminent. The article appeared on the front page of the newspaper and refer *382 enced Bennett’s expunged conviction. This article prompted the following colloquy:
The Court: But, you know, since you mentioned the article, where’s this coming from? I thought that there is a prohibition against counsel speaking to — making public statements designed to affect trial.
Ms. Hardy [defense counsel]: There certainly is. There’s an ethics rule which prohibits counsel from intentionally trying to taint a jury pool by making the public aware of excluded evidence, which is exactly what’s been occurring for quite some time.
The Court: Is counsel being quoted in this?
Mr. Washington [plaintiff’s counsel]: I think counsel on both sides. Ford was not, but Mr. Morgan and Ms. Massie and I were both quoted, all quoted.
The Court: I’m not sure — well—
Ms. Hardy: It was initiated, without a doubt, and Mr. Washington will not dispute this, by Mr. Washington, as all the press has been initiated by his office, and the constant publicity is one issue, but the really serious issue is the effort by Mr. Washington to make sure that the press continues to report evidence or information concerning this expunged conviction so that some way, somehow, irrespective of this Court’s ruling — [11]
*383 The Court-. I’m not making any decisions about this, but I’m going to tell you one thing. If I ever reach the conclusion that somebody is violating that ethical obligation and causing some difficulty in our getting a fair jury, I will dismiss the case with prejudice, or, and I should say, on the other side, grant a default judgment. I just want everyone to know that. And then whatever counsel is involved can answer to their client. [Emphasis added.]
The court denied the motion to dissolve Judge Macdonald’s previous order of exclusion.
Three days later, on June 24, 2002, plaintiff was deposed, at which time she admitted that she had disclosed facts regarding Bennett’s expunged conviction despite the trial court’s order disallowing such evidence. The following colloquy took place:
[Defense counsel]: If you can give me a ballpark figure, how many times since you found out about the expungement have you told other people about the fact that Mr. Bennett had this conviction that was later expunged?
[Plaintiff’s counsel]: You mean at people, period, one person at a time?
[Defense counsel]: Any individual, whether it’s groups, how many times has she gone out and publicized it, divulged it.
[Plaintiffl: I have no idea. It’s been a lot.
Q. Over 100?
A. I don’t know.
Q. Over ten?
A. Oh, definitely over ten, possibly over 100.
Q. Okay.
A. If I could get it out on the Internet, I would put it out on the Internet.
*384 Moreover, plaintiff admitted during her deposition on June 24, 2002, that she would continue to disclose facts regarding Bennett’s expunged conviction. She stated:
A. I’m aware that you’re whining and crying because I’m talking about it all over town, yes, I am aware of that. I won’t shut up about it. It’s the truth. You can expunge it, but it’s the truth, and I’m going to tell it, and you know what? I will tell anybody that will listen because this man is a menace and he must be stopped, and you know it and you know it [sic]. But you guys want to protect him, that’s fine, I’m not. I don’t have to protect Mr. Bennett.
Q. So you’ve been talking about it—
A. To anyone.
Q. —any chance you get, to anyone—
A. That’s Right.
Q. —even though-even since you became aware that it was expunged?
A. Yes. Absolutely.
On June 26, 2002, two days after the deposition, plaintiff and certain of her counsel participated in a “Justice for Justine Committee” demonstration outside Ford headquarters. During the demonstration, participants distributed leaflets to the public containing information regarding Bennett’s expunged conviction and evidence regarding Bennett’s alleged behavior toward other female Ford employees that the trial court had ruled inadmissible. The leaflet also stated that Judge Giovan “is in Ford’s pocket” and “is trying to keep the truth out of the courtroom.” Also on this day, a television interview was broadcast on WDIV Channel 4, in which plaintiff stated:
If we don’t act the way he [Judge Giovan] wants it, the way he sees fit, then he’ll dismiss my case with prejudice. And what he doesn’t know is, it doesn’t bother me, because I’m not going to quit fighting against sexual harassment.
*385 A demonstration similar to that held on June 26, 2002, was held the following day at the Ford Wixom plant, at which a similar leaflet was distributed.[12]
On June 28, 2002, defendants moved to dismiss plaintiffs suit on the basis that plaintiff and her counsel engaged in improper pretrial publicity aimed at tainting the potential jury pool. On July 1, 2002, plaintiff responded by moving to disqualify Judge Giovan. On July 3, 2002, Judge Giovan heard and denied this motion. The same day, plaintiffs counsel, Miranda Massie, appeared in a television interview broadcast on WDiy Channel 4. She stated:
Metro Detroit has a company town feeling, and it’s hard to get a fair hearing from any of these judges when you’re going against the Ford Motor Company. They’ll stop at nothing to maintain the culture of abuse that exists in those plants, and we’ve found it hard to get unbiased judicial rulings in these cases.[13]
On July 8, 2002, the date on which jury selection was to begin, Judge Timothy Kenny heard plaintiffs appeal of Judge Giovan’s denial of the motion for his disqualification and affirmed the denial. Also on July 8, 2002, Judge Giovan heard defendant’s motion to dismiss.[14] Throughout the hearing, plaintiff and her counsel were *386 discourteous to and uncooperative with the court. Specifically, in response to the court’s question, “Are you a member of the ‘Justice for Justine’ committee?” plaintiffs counsel, Jodi Masley, responded by stating:
Nobody’s ever asked me that in my life. I — you know what. I fully support the “Justice for Justine”, you know, committee. They have every right to do everything they [want]. And did I participate in a demonstration that was called by the “Justice for Justine” committee, I did.
Judge Giovan attempted to respond to Ms. Masley’s comment, but she interrupted him, stating, “I mean, have I or have I ever been a member of the Communist Party, is that what this is?” Moreover, in response to Judge Giovan’s inquiry regarding whether members of the “Justice for Justine” committee were present in the court, Ms. Masley stated:
Have you guys even ever heard of the phrase “Freedom of association... ?”
I have no idea. Do they need to know — identify their political affiliations ... ?
(Interposing) Who did you guys vote for in the last judicial election?
The hearing continued into the following day. At the conclusion of the two-day hearing, plaintiff requested permission to file a supplemental brief, which Judge Giovan granted.
On August 21, 2002, Judge Giovan issued an opinion and order dismissing plaintiffs case with prejudice, concluding that plaintiff and her counsel had engaged in premeditated misconduct designed to tamper with *387 the administration of justice and that no lesser sanction would deter plaintiff or her counsel.[15]
The Court of Appeals, affirmed in part, reversed in part, and acknowledged the trial court’s authority to dismiss plaintiff’s complaint, but remanded the case to the trial court to hold an evidentiary hearing to determine whether plaintiffs and her counsel’s comments actually prejudiced the jury pool.[16]
Defendant sought leave to appeal to this Court. We directed the clerk to schedule oral argument on whether to grant the application or to take other peremptory action.[17]
II. STANDARD of review
This case requires us to determine whether the Court *388 of Appeals erred in reversing the trial court’s dismissal of this case. Trial courts possess the inherent authority to sanction litigants and their counsel, including the right to dismiss an action. Banta, supra at 368. “An exercise of the court’s ‘inherent power’ may be disturbed only upon a finding that there has been a clear abuse of discretion.” Brenner v Kolk, 226 Mich App 149, 160; 573 NW2d 65 (1997). A trial court’s dismissal of a case for failure to comply with the court’s orders is also reviewed for an abuse of discretion. Thorne v Carter, 149 Mich App 90, 93; 385 NW2d 738 (1986); MCR 2.504(B)(1).
In People v Babcock, 469 Mich 247, 269; 666 NW2d 231 (2003), this Court noted that an abuse of discretion standard must be one that is more deferential than review de novo, but less deferential than the standard set forth in Spalding v Spalding, 355 Mich 382; 94 NW2d 810 (1959). This Court stated that “an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome.” Babcock, supra at 269. The Babcock Court further noted that “[w]hen the trial court selects one of these principled outcomes, the trial court has not abused its discretion and, thus, it is proper for the reviewing court to defer to the trial court’s judgment.” Id. While Babcock dealt with a criminal sentencing issue, we prefer the articulation of the abuse of discretion standard in Babcock to the Spalding test and, thus, adopt it as the default abuse of discretion standard.
Additionally, in cases raising First Amendment issues, an appellate court is obligated to independently review the entire record to ensure that the lower court’s judgment “ ‘ “does not constitute a forbidden intrusion *389 of the field of free expression.” ’ ” Gentile, supra at 1038, quoting Bose Corp v Consumers Union of United States, Inc, 466 US 485, 499; 109 S Ct 1949; 80 L Ed 2d 502 (1984), quoting New York Times Co v Sullivan, 376 US 254, 258; 84 S Ct 710; 11 L Ed 2d 686 (1964).
III. ANALYSIS
A. TRIAL COURT’S AUTHORITY TO SANCTION LITIGANTS FOR UNETHICAL BEHAVIOR
As stated above, trial courts possess the inherent authority to sanction litigants and their counsel, including the power to dismiss an action. Banta, supra at 368. “The authority to dismiss a lawsuit for litigant misconduct is a creature of the ‘clean hands doctrine’ and, despite its origins, is applicable to both equitable and legal damages claims.” Cummings v Wayne Co, 210 Mich App 249, 252; 533 NW2d 13 (1995), citing Buchanan Home & Auto Supply Co v Firestone Tire & Rubber Co, 544 F Supp 242, 244-245 (D SC, 1981). “The authority is rooted in a court’s fundamental interest in protecting its own integrity and that of the judicial process.” Cummings, supra at 252. “The ‘clean hands doctrine’ applies not only for the protection of the parties but also for the protection of the court.” Id., citing Buchanan Home, supra at 244.
Moreover, the Michigan Constitution confers on the judicial department all the authority necessary to exercise its powers as a coordinate branch of government. “Const 1963, art 3, § 2 divides the powers of government among three branches and commits to each branch exclusive exercise of the functions properly belonging to it, except as otherwise expressly provided in the Constitution.”[18] In re 1976 PA 267, 400 Mich 660, *390 662; 255 NW2d 635 (1977). “Art 6, § 1 vests the judicial power of the state exclusively in one court of justice.”[19] Id. “Section 4 of that article[20] vests general superintending control over all courts in the state in the Supreme Court and § 5 confers upon this Court the power to make rules to govern the practice and procedure within the courts.”[21] Id. “It is also well settled that under our form of government the Constitution confers on the judicial department all the authority necessary to exercise its powers as a coordinate branch of government.” Id. at 662-663. “The judicial powers derived from the Constitution include rulemaking, supervisory *391 and other administrative powers as well as traditional adjudicative ones.” Id. at 663. “They have been exclusively entrusted to the judiciary by the Constitution and may not be diminished, exercised by, nor interfered with by the other branches of government without constitutional authorization.” Id., citing Attorney General ex rel Cook v O’Neill, 280 Mich 649; 275 NW 445 (1937).
Moreover, express authority to dismiss a complaint is conferred by statute and court rule in Michigan. MCL 600.611 provides that “[c]ircuit courts have jurisdiction and power to make any order proper to fully effectuate the circuit courts’ jurisdiction and judgments.” Additionally, MCR 2.504(B)(1) provides that “[i]f the plaintiff fails to comply with [the court] rules or a court order, a defendant may move for dismissal of an action or a claim against that defendant.”
Several of the Michigan Rules of Professional Conduct address sanctionable attorney conduct. MRPC 3.6 concerns trial publicity. It provides:
A lawyer shall not make an extrajudicial statement that a reasonable person would expect to he disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding. [Emphasis added.]
MRPC 3.5 addresses impartiality and decorum of the tribunal. It states:
A lawyer shall not:
(a) seek to influence a judge, juror, prospective juror or other official by means prohibited by law,
(b) communicate ex parte with such a person concerning a pending matter except as permitted by law; or
(c) engage in undignified or discourteous conduct toward the tribunal. [Emphasis added.]
*392 Finally, MRPC 8.4 deals with attorney misconduct. It provides, in relevant part:
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(b) engage in conduct involving dishonesty, fraud, deceit, misrepresentation, or violation of the criminal law, where such conduct reflects adversely on the lawyer’s honesty, trustworthiness, or fitness as a lawyer;
(c) engage in conduct that is prejudicial to the administration of justice.
B. THE TRIAL COURT’S AUTHORITY TO DISMISS THIS CASE
In this case, Judge Macdonald initially concluded that evidence of Bennett’s prior conviction was inadmissible before the jury because of its unduly prejudicial nature. Rather than abiding by the trial court’s order, even after both the Court of Appeals and this Court denied plaintiff leave to appeal regarding the order, plaintiff and her counsel engaged in a concerted and wide-ranging campaign in the weeks before various scheduled trial dates to publicize the details of the inadmissible evidence through the mass media and other available means. They continued to do so even after the trial court explicitly warned them that such misconduct would result in the dismissal of plaintiffs lawsuit.
The trial court has a gate-keeping obligation, when such misconduct occurs, to impose sanctions that will not only deter the misconduct but also serve as a deterrent to other litigants.
Moreover, MCL 600.611 and MCR 2.504(B)(1) provide the trial court with the authority to impose sane *393 tions such as dismissal. Here, Judge Macdonald issued an order excluding evidence regarding Bennett’s expunged conviction. Judge Giovan later reaffirmed Judge Macdonald’s initial order of exclusion, and explicitly warned the parties that he would dismiss the case if the inappropriate remarks regarding the excluded conviction continued.[22]
*394 Plaintiffs understanding of Judge Macdonald’s order and Judge Giovan’s warning to adhere to the order was clearly demonstrated in her deposition and in the June 26, 2002, television interview that was broadcast on WDIV Channel 4 in which she acknowledged Judge Giovan’s warning that dismissal would result if she continued her behavior, but further stated that “it doesn’t bother me, because I’m not going to quit fighting against sexual harassment.”
Plaintiffs counsel also clearly understood Judge Macdonald’s order and Judge Giovan’s explicit warning to adhere to the order. The trial court twice explicitly discussed the improper conduct with plaintiffs counsel and warned everyone about the consequences of continuing misconduct. Despite the warning, and despite the approaching trial, plaintiff and her counsel continued the misconduct.[23] In fact, as Judge Giovan noted, *395 plaintiffs lead counsel, George Washington and Miranda Massie, appeared in television news broadcasts that specifically referred to Bennett’s expunged conviction. Moreover, plaintiffs counsel acknowledged that counsel could possibly be violating the expungement statute by publicly disseminating information regarding Bennett’s expunged conviction, but stated that it was “worth the risk.” Also of note is Ms. Masley’s statement at the July 8, 2002, hearing that “Ms. Maldonado has a right to speak about Mr. Bennett’s conviction for sure.” She further stated that plaintiff and her counsel, depending on how close it was to trial, had the right to publicize evidence that had been excluded by the court.
Judge Giovan properly noted that, notwithstanding the rulings of two judges and the apparent illegality of disclosing Bennett’s excluded conviction, nothing would deter plaintiff from continuing to publicize information regarding Bennett’s excluded conviction. Plaintiff so admitted in her deposition. Even without an explicit order precluding plaintiff and her counsel from publicizing Bennett’s excluded conviction, Judge Giovan chose a principled option in dismissing plaintiffs case in order to protect the administration of justice. The imposition of any lesser sanction would have been unjust in light of plaintiffs and her counsel’s flagrant misbehavior.[24]
*396 Not only did plaintiff and her counsel disregard Judge Macdonald’s order and Judge Giovan’s explicit warning to respect the order, counsel violated numerous rules of professional conduct. Plaintiffs counsel’s public references to Bennett’s excluded conviction violated MRPC 3.6, which was the basis for Judge Giovan’s dismissal. Plaintiffs counsel reasonably knew or should have known that their comments would have a substantial likelihood of materially prejudicing the proceedings by improperly influencing prospective jurors regarding Bennett’s propensities to commit sexual harassment, especially since trial was approximately two weeks away.
Plaintiff argues that Judge Giovan improperly relied on MRPC 3.6 in dismissing plaintiffs case. She contends that Judge Giovan’s dismissal was solely based on plaintiffs comments, and that MRPC 3.6 does not apply to nonlawyers. Plaintiff correctly argues that the Michigan Rules of Professional Conduct do not apply to nonlawyers, but mistakenly contends that Judge Giovan relied only on her behavior in ordering a dismissal. Plaintiff also erroneously contends that she is free to engage in improper pretrial publicity designed to taint the potential jury pool. The Michigan Court Rules do apply to plaintiff. They authorize the trial court to impose sanctions such as dismissal for party misconduct. MCR 2.504(B)(1). Judge Giovan expressly warned plaintiff that if she continued to disseminate informa *397 tion regarding Bennett’s excluded conviction in violation of Judge Macdonald’s order, he would dismiss her case. Plaintiff failed to obey this warning and, thus, Judge Giovan properly dismissed her case.[25] In any event, even if plaintiff is not bound by MRPC 3.6, plaintiffs counsel’s repeated public references to Bennett’s excluded conviction, coupled with Ms. Massie’s statement five days before trial that “Metro Detroit” judges were biased in favor of the Ford Motor Company, were substantially likely to materially prejudice the proceedings and improperly influence prospective jurors.
Judge Giovan did not reach a conclusion regarding a possible violation of MRPC 3.5, finding it was unnecessary because he dismissed the case under MRPC 3.6. Because Judge Giovan did not rely on this rule in dismissing the case, we need not reach a conclusion regarding a possible violation of the rule. We nevertheless enumerate plaintiffs counsel’s acts of disrespect against the trial court to highlight plaintiff’s counsel’s undignified and discourteous conduct toward the trial court.
Plaintiffs counsel, on numerous occasions, despite court orders and an explicit warning by the trial court, publicly divulged information regarding Bennett’s excluded conviction. Plaintiffs counsel also deliberately disregarded the trial court’s oral directive to refrain from *398 disseminating information regarding Bennett’s excluded conviction. Ms. Masley sarcastically responded to the trial court’s questioning at the dismissal hearing, and at one point, while on the stand, turned to members of the “Justice for Justine” committee present in the courtroom and asked them who they voted for in the last judicial election. Additionally, Ms. Massie commented during a July 3, 2002, television interview that “Metro Detroit” judges are biased toward the Ford Motor Company. While this conduct may not amount to a violation of MRPC 3.5, it further justifies Judge Giovan’s dismissal for plaintiffs and her counsel’s participation in pretrial publicity designed to taint the jury pool.
We also note MRPC 8.4, although Judge Giovan did not rely on this rule in ordering dismissal. MRPC 8.4 prohibits lawyers from engaging in conduct that is prejudicial to the administration of justice. MRPC 8.4(a) prohibits lawyers from engaging in misconduct through the acts of others. Here, plaintiffs counsel not only failed to restrain plaintiff from repeatedly and intentionally publicizing Bennett’s inadmissible expunged conviction in order to taint the potential jury pool and deny defendants a fair trial, they participated with plaintiff in the misconduct on numerous occasions. This inappropriate and unprofessional conduct directly violated Judge Macdonald’s order, Judge Giovan’s reaffirmance of the order, and Judge Giovan’s explicit warning. Moreover, this conduct was directly aimed at frustrating the due administration of justice. It also supports the dismissal of plaintiffs complaint.
C. THE FIRST AMENDMENT AND A TRIAL COURT’S ABILITY TO RESTRICT SPEECH
The First Amendment guarantees that the freedom of speech shall not be abridged. It states:
*399 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. [US Const, Am I.]
In Gentile, the United States Supreme Court addressed the standard governing the state’s ability to discipline an attorney under an ethical rule that is identical in all relevant respects to MRPC 3.6, regarding speech about parties or proceedings in which an attorney is involved. The Court rejected the petitioner attorney’s claim that he should be held to the “clear and present danger” standard applicable to the press, and concluded that “the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press.” Gentile, supra at 1074. The Court, in an opinion by Chief Justice Rehnquist, explained:
We agree with the majority of the States that the “substantial likelihood of material prejudice” standard constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State’s interest in fair trials.
When a state regulation implicates First Amendment rights, the Court must balance those interests against the State’s legitimate interest in regulating the activity in question. The “substantial likelihood” test... is constitutional ... for it is designed to protect the integrity and fairness of a state’s judicial system and it imposes only narrow and necessary limitations on lawyers’ speech. The limitations are aimed at two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found. [Id. at 1075 (emphasis added).]
The Court noted that “[ljawyers representing clients in pending cases are key participants in the criminal *400 justice system, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct.” Id. at 1074. The Court further observed that “[flew, if any, interests under the Constitution are more fundamental than the right to a fair trial by ‘impartial’ jurors, and an outcome affected by extrajudicial statements would violate that fundamental right.” Id. at 1075.
Judge Giovan, after reviewing Gentile, found a substantial likelihood of prejudice:
More important, however, is that the plaintiff should not be heard to make her argument, which goes like this: “We deny that our behavior was intended to have a substantial likelihood of prejudice. But even if you establish that it was, you cannot dismiss the plaintiffs case until you establish that it has achieved its intended effect.”
We believe otherwise. That is not an acceptable standard for preserving the integrity of a court system. The behavior in question has been intentional, premeditated, and intransigent. It was designed to reach the farthest boundaries of the public consciousness. It should be presumed to have had its intended effect.
The Court of Appeals acknowledged that the applicable test under Gentile is whether the conduct generated a “substantial likelihood” of prejudice, yet remanded for an evidentiary hearing to determine whether “actual” prejudice occurred.
We hereby affirm the trial court’s understanding of Gentile. Plaintiffs and her counsel’s numerous public references to Bennett’s inadmissible, expunged indecent exposure conviction, despite a court order excluding such evidence, were obviously intended to prejudice potential jurors. The trial court thus warned the parties and counsel that all public references to the expunged conviction in violation of the ethical rules would result *401 in dismissal. This limitation on plaintiffs and her counsel’s speech only applied to speech that was substantially likely to have a materially prejudicial effect and that, therefore, violated the rules of ethics. It did not prohibit plaintiff and her counsel from speaking about sexual harassment or the general nature of plaintiffs case. Judge Giovan, at the dismissal hearing, acknowledged the importance of upholding the First Amendment and drew a distinction between protected speech and speech merely designed to thwart the judicial process. He stated to defense counsel:
Well, now, before we move further, I think you understand that we need to draw a distinction between a party’s willingness and right to disseminate to the public their ideas of how they’ve been unjustly treated and the like, and even criticism of the Court as opposed to what’s really at stake here, and that is efforts to thwart the judicial system, and that is to disseminate, for example, excluded evidence and evidence forbidden to be disseminated by statute, which you have referred to. But nevertheless, you do need to differentiate between those two things.
The rules of evidence are designed to ensure fairness in the administration of justice, eliminate unjustifiable expense and delay, and promote the growth and development of the law of evidence. MRE 102. Judge Macdonald’s exclusion of Bennett’s expunged conviction was based on the rules of evidence. She specifically relied on MRE 404(b) in excluding the evidence, determining that the evidence would not be offered for any purpose other than to show Bennett’s propensity to conduct himself in this manner. Judge Macdonald further relied on MRE 403 to determine that, even if the evidence were relevant, its undue prejudice substantially outweighed its probative value in light of the availability of alternative means of proof. Judge Macdonald’s ruling, and Judge Giovan’s subsequent limita *402 tion on plaintiffs and her counsel’s speech, was in accord with the purpose of the evidentiary rules. Moreover, the rulings were necessary to protect defendants’ fundamental right to a fair trial and were directly aimed at protecting potential jurors from prejudice.
As the United States Supreme Court noted in the Gentile case, few, if any, interests are more fundamental than the right to a fair trial by an impartial jury. Plaintiff stated that nothing would deter her from continuing to publicize Bennett’s expunged conviction, and that she would post it on the Internet if she could. Additionally, plaintiffs counsel, despite court orders, publicly divulged information regarding the excluded expunged conviction. Judge Giovan merely exercised his “ ‘affirmative constitutional duty’ to minimize the potential for prejudicial pretrial publicity,” United States v Houbriti, 307 F Supp 2d 891, 897 (ED Mich, 2004), quoting Gannett Co, Inc v DePasquale, 443 US 368, 378; 99 S Ct 2898; 61 L Ed 2d 608 (1979), in dismissing plaintiffs case, and did not violate the First Amendment in doing so.
The Court of Appeals requirement that actual prejudice be shown conflicts not only with the “substantial likelihood” test set forth in Gentile, but also with the plain language of MRPC 3.6. Moreover, the Court of Appeals standard has no practical workability. It would be impossible to determine “actual prejudice” to a potential jury pool three years after the incident in question. We decline to order an evidentiary hearing that is no more than a fool’s errand. The trial court narrowly tailored a restriction on plaintiffs and her counsel’s speech consonant with the Michigan Rules of Professional Conduct. The trial court’s limitation on plaintiffs and her counsel’s speech was narrowly tai *403 lored and necessary to prevent prejudice to the potential jury pool and did not violate the First Amendment.
IV RESPONSE TO JUSTICE CAVANAGH’S DISSENT
Justice CAVANAGH asserts that the majority opinion violates the First Amendment by restricting speech that does not have a substantial likelihood of materially prejudicing the proceedings. We reiterate that the narrow and necessary limitation on plaintiffs and her counsel’s speech only applied to Bennett’s expunged prior conviction that had been excluded as evidence. Plaintiff and her counsel remained free to discuss the general nature of her case and sexual harassment. We agree with Justice CAVANAGH that the First Amendment does protect even offensive expressions, see, e.g., R A V v City of St Paul, 505 US 377; 112 S Ct 2538; 120 L Ed 2d 305 (1992). The First Amendment, however, does not protect all speech in whatever circumstances. See, e.g., Adderley v Florida, 385 US 39; 87 S Ct 242; 17 L Ed 2d 149 (1966). The United States Supreme Court has recognized the need to balance the rights of attorneys and litigants in pending cases and the state’s interest in fair trials. In recognizing this tension, the Court has held that the First Amendment does not protect speech that has a substantial likelihood of materially prejudicing the proceedings. Contrary to Justice CAVANAGH’s implication that plaintiff is being punished for being discourteous and offensive toward the court, we affirm the dismissal of plaintiffs case solely because plaintiff and plaintiffs counsel made numerous references to excluded evidence, despite the trial court’s oral warning that dismissal would result if such references continued, for the sole purpose of tainting the-potential jury pool and denying defendants a fair trial.
*404 Justice CAVANAGH opines that plaintiffs and her counsel’s references to the excluded evidence did not have a substantial likelihood of materially prejudicing the proceedings. We, however, fail to see how plaintiffs and her counsel’s numerous public references to Bennett’s prior indecent exposure conviction, after the court ordered the exclusion of that evidence, did not have a substantial likelihood of materially prejudicing this sexual harassment proceeding. The excluded indecent exposure conviction, which was subsequently expunged, involved sexual behavior that is very similar to the alleged sexual behavior in this case. It could be offered for no other purpose than to show Bennett’s propensity to conduct himself in this manner. This is the exact type of evidence that MRE 404(b) precludes. If the narrow limitation on speech in this case cannot pass muster under the substantial likelihood test of Gentile, we fail to see what limitation could survive.[26]
V CONCLUSION
We conclude that the trial court did not abuse its discretion in dismissing plaintiffs suit. We further hold *405 that the trial court’s explicit warning prohibiting any references to Bennett’s excluded conviction did not violate the First Amendment. Accordingly, we reverse the judgment of the Court of Appeals and reinstate the trial court’s order dismissing plaintiffs case. Because we hold that a dismissal is appropriate, we need not decide the remaining issue. Additionally, we do not reach the issues in plaintiffs cross-application because they are moot in light of our reinstatement of the trial court’s order of dismissal.
Taylor, C.J., and Young and MarkmaN, JJ., concurred with Corrigan, J.

 We have previously considered other actions in which Daniel Bennett was accused of sexual harassment, Elezovic v Ford Motor Co, 472 Mich 408; 697 NW2d 851 (2005), and McClements v Ford Motor Co, 473 Mich 373; 702 NW2d 166 (2005), mod 474 Mich 1201 (2005).

 In the Elezovic case, Judge Macdonald also issued an order directing that witnesses be instructed that reference to Bennett’s excluded conviction or any other excluded evidence would be considered a contempt of court, and would result in sanctions, including compensation to the court in the case of a mistrial. All the witnesses in that case, including plaintiff Justine Maldonado, signed statements indicating that they had been advised of the court’s ruling regarding inadmissible evidence, that they were not to mention any excluded evidence, and that they understood that sanctions would result from mentioning any excluded evidence.
As Justice Cavanagh notes, Judge Macdonald stated, upon entering the order of exclusion, that she might reconsider her decision to exclude the evidence during the course of the trial if need be. Justice CAVANAGH, however, erroneously relies on this statement to conclude that plaintiff and her counsel were not precluded from “ever mentioning the indecent exposure conviction in public again ....” Post at 408 (emphasis omitted). Judge Macdonald’s order remained in effect throughout this case. As such, plaintiff and her counsel were bound by the order.

 465 Mich 971 (2002).

 Justice Weaver claims that plaintiff only, and not her counsel, made public statements about the excluded conviction after Judge Macdonald entered the order of exclusion. The September 11 press release, however, *379 which referred to the excluded conviction, was issued by plaintiffs counsel after the order of exclusion was entered.

 The following is a list of the publications stemming from plaintiffs counsel’s September 11, 2001, press release, many of which refer to Bennett’s excluded conviction: (1) The Associated Press wire story, September 12, 2001, referencing the excluded conviction; (2) an article in the Detroit Free Press, September 13, 2001, referencing the excluded conviction; (3) an article by the United Press International, October 10, 2001, referencing the excluded conviction; (4) The Associated Press wire story, October 10, 2001, referencing the excluded conviction; (5) a Fox 2 news broadcast held at the law office of Scheff and Washington, October 10, 2001, referencing the excluded conviction and providing a closeup of the conviction papers; (6) a WDIV news broadcast, October 10, 2001, referencing the excluded propensity evidence; and (7) an article in the Oakland Press, October 11, 2001, referencing the excluded conviction.
Justice Weaver contends that we assert that plaintiffs counsel referred to the excluded conviction in these publications. We assert no such thing. Rather, we merely state that these publications stem from plaintiffs counsel’s September 11, 2001, press release. In other words, it was plaintiffs counsel’s press release that prompted the mass of publications. Plaintiffs counsel’s press release was designed to draw media attention to the excluded conviction and, as shown above, indeed accomplished its goal.

 The expungement statute states:
Except as provided in subsection (2), a person, other than the applicant, who knows or should have known that a conviction was set aside under this section and who divulges, uses, or publishes information concerning a conviction set aside under this section is guilty of a misdemeanor punishable by imprisonment for not more than 90 days or a fine of not more than $500.00, or both. [MCL 780.623(5).]

 Plaintiffs counsel’s comments at this meeting also demonstrate that plaintiffs counsel continued to make public references to the excluded evidence despite the court order, contrary to Justice Weaver’s contention.

 Justice Cavanagh mischaracterizes Judge Giovan’s refusal to unnecessarily order an attorney to follow the law as a refusal to require the parties to refrain from referencing the excluded evidence. Justice Cavanagh’s miseharacterization that “the trial court never thought it issued an order” in this case is preposterous. Post at 420. While Judge Giovan did not specifically enter a gag order, he did, on numerous occasions, direct the parties to abide by Judge Macdonald’s order of exclusion, he subsequently denied plaintiffs motion to dissolve the order, and he orally warned the parties that dismissal would result for failure to abide by the order. Moreover, Justice Cavanagh’s mischar *381 acterization of the lower court transcript is rebutted by plaintiffs own comment, “If we don’t act the way he [Judge Giovan] wants it, the way he sees fit, then he’ll dismiss my case with prejudice.”

 The following is a list of the publications stemming from plaintiffs counsel’s May 17, 2002, meeting with the media, some of which also referred to evidence that had been excluded before trial: (1) a WDIV news broadcast, May 17, 2002, referencing the excluded propensity evidence; (2) a WXYZ news broadcast, May 17, 2002, also referencing the excluded propensity evidence; and (3) The Associated Press local wire story, May 17, 2002, referencing the expunged conviction.
Again, contrary to Justice Weaver’s contention, we do not assert that plaintiffs counsel actually made references to the excluded evidence in these publications. Rather, we assert that these publications stem from plaintiffs counsel’s meeting with the media.

 Plaintiffs counsel, George Washington, Miranda Massie, and Jodi Masley, are all members of the BAMN organization.

11 Although the article contained quotations from both plaintiffs counsel and defense counsel, defendant claimed that plaintiffs attorney provided the reporter with the extensive information in the article regarding Bennett’s excluded conviction. Plaintiff did not deny this allegation.
Justice Cavanagh contends that because Bennett’s counsel, on two occasions, referred publicly to Bennett’s excluded conviction, plaintiff should not be punished for behaving as defense counsel did. We acknowledge that Bennett’s counsel publicly referred to Bennett’s excluded conviction. We disagree, however, that defense counsel’s behavior mirrored that of plaintiff and her counsel. Bennett’s counsel’s limited references to the excluded evidence were prompted by plaintiff and her counsel. Defense counsel’s statements were made in an attempt to minimize the damage caused by plaintiffs and her counsel’s numerous *383 public references to the excluded evidence. Unlike plaintiffs and her counsel’s public comments regarding the excluded evidence, defense counsel’s comments were not intended to taint the potential jury pool and cause prejudice to plaintiff.

 The following publications stemmed from the June 26 and 27 demonstrations: (1) a WDIV news broadcast, June 26, 2002, showing picketers holding signs stating, “Ford, stop buying judges”; (2) a Click on Detroit, Channel 4 website article, June 26, 2002, referencing the exclusion of the propensity evidence; and (3) an article in the Detroit News, June 27, 2002.

13 As a result of this news broadcast, the following publications were released: (1) a Click on Detroit, Channel 4 website article, July 3, 2002, referencing plaintiffs and her counsel’s belief that Judge Giovan was biased; and (2) a Channel 50 news broadcast, July 3, 2002, in which plaintiff stated that money cannot buy justice.

 Also on this day, an article was published on the Click on Detroit, Channel 4 website concerning Judge Giovan’s alleged bias.

 Justice Weaver contends that Judge Giovan improperly attributed responsibility for plaintiffs improper references to plaintiffs counsel. As these facts clearly demonstrate, however, Judge Giovan properly determined that both plaintiff and her counsel engaged in behavior designed to taint the potential jury pool.
Justice Weaver further contends that plaintiff was not restricted by any order or court rule from making repeated public references to Bennett’s prior conviction. While we disagree with the contention that no order or court rule barred plaintiff from making pubic references to the excluded evidence, we reiterate that, whether a court order existed or whether a court rule applied, plaintiff was not free to repeatedly publicize excluded evidence, especially with the trial impending. The only conclusion that can logically be drawn from plaintiff’s repeated references to the excluded conviction is that plaintiff was improperly attempting to admit the excluded evidence by means of the mass media. Consequentially, Judge Giovan chose a principled option within his authority in dismissing plaintiff’s case in order to protect the administration of justice. Banta, supra at 368; Cummings v Wayne Co, 210 Mich App 249, 252; 533 NW2d 13 (1995), citing Buchanan Home & Auto Supply Co v Firestone Tire & Rubber Co, 544 F Supp 242, 244-245 (D SC, 1981).

 Unpublished opinion per curiam of the Court of Appeals, issued April 22, 2004 (Docket No. 243763).

 471 Mich 940 (2004).

 Const 1963, art 3, § 2 provides:
*390 The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in the constitution.

 Const 1963, art 6, § 1 provides:
The judicial power of the state is vested exclusively in one court of justice which shall be divided into one supreme court, one court of appeals, one trial court of general jurisdiction known as the circuit court, one probate court, and courts of limited jurisdiction that the legislature may establish by a two-thirds vote of the members elected to and serving in each house.

20 Const 1964, art 6, § 4 provides:
The supreme court shall have general superintending control over all courts; power to issue, hear and determine prerogative and remedial writs; and appellate jurisdiction as provided by rules of the supreme court. The supreme court shall not have the power to remove a judge.

 Const 1964, art 6, § 5 provides:
The supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state. The distinctions between law and equity proceedings shall, as far as practicable, be abolished. The office of master in chancery is prohibited.

 Both Justice Cavanagh and Justice Weaver claim that Judge Giovan’s ■warning to refrain from engaging in pretrial publicity was not an order of the court. In doing so, they rely on Judge Giovan’s statement that he “never issued a gag order” in this case. The dissenting justices, however, take this statement out of context. Judge Giovan clearly explained that a gag order was not necessary because rules were already in place governing pretrial publicity:
So, what I say, I’m not going to issue a gag order because the rules of professional conduct already have a standard that bind you. So, why should Judge Giovan, who is only one of thousands of judges, select his own criteria for what people should say when we have standing rules that govern what attorneys are permitted to say?
And one of the things that attorneys are not permitted to do is to make public statements that are intended to influence the outcome of a case. And when your opponents after several times coming to court accusing you and your colleagues and maybe the parties themselves of doing precisely that, I took no action.
But after — on the day that this did occur, I had seen a long article about this case, I had heard counsel say on many occasions, as you have said here today, that you have invited public examination of this case, all I said was that if I should find that the rules were violated, I would take corrective action, which could include dismissing the case.
Now, I was not referring to some mysterious, illusory, ambiguous rule fixed in my mind and known to nobody else. It’s obvious I was not saying that, that I was going to take action or not based on a rule that I invented and disclosed to no one.
What was obvious to anyone that what I was saying is that if I found that the rule of professional conduct was violated, that is to *394 say that counsel or parties were making public statements intended to affect the outcome of this case, I would take action.

 Justice Cavanagh suggests that Judge Giovan’s warning not to discuss the excluded conviction with the press was somehow insufficient to convey to the parties that they were not to discuss the excluded conviction with the media. Post at 410-412. We strongly disagree. The transcript of this exchange, which we have set forth on pages 382-383 of this opinion, makes it quite clear that the parties were advised in no uncertain terms that references to the excluded conviction were to cease. Contrary to Justice Cavanagh’s assertion, Judge Giovan explicitly warned the parties and the attorneys that further references to the excluded conviction would result in dismissal. Although Judge Giovan did not embody this warning in a written order, the warning did not consist of “general comments... made in passing to both parties.” Post at 414. Rather, the warning was explicit and made on the record in open court. All involved were clearly aware of what was prohibited. To require a formal written order — as it appears Justice Cavanagh would — would be to permit any litigant or attorney to disregard an explicitly conveyed and clearly understood obligation on the ground that it was not communicated in a written order. Such a rule would lead only to gamesmanship and we decline to adopt it.
*395 Plaintiff was well aware of Judge Giovan’s explicit warning to refrain from making public references to the excluded conviction and of the consequences of fading to abide by the warning. Moreover, as demonstrated throughout this opinion, plaintiff failed to abide by the warning on numerous occasions.

 Justice Cavanagh suggests that the trial court had “numerous other options” available to it as sanctions apart from dismissal. Post at 419. Even if we agreed with this assertion, it is irrelevant in determining whether the sanction actually chosen — dismissal in this case — was within *396 the range of “reasonable and principled outcome[s].” Babcock, supra at 269. In light of the repeated violation of the court’s instruction not to publicize the excluded conviction, we cannot say that Judge Giovan’s conclusion that nothing short of dismissal would deter plaintiffs and her counsel’s repeated misconduct was incorrect. As such, even if we were to assume that there were other sanctions available — which we do not necessarily believe to be the case — the sanction of dismissal was clearly within the range of reasonableness under the circumstances.

 Justice Cavanagh contends that we attempt to portray Judge Macdonald’s order excluding Bennett’s prior conviction as having the same effect as an order precluding any mention of this evidence in public. We, however, do not misconstrue the order of exclusion as an order precluding any mention of the evidence in public. Rather, we rely on the order of exclusion in concluding that plaintiffs and her counsel’s numerous references to the excluded evidence just weeks before trial was to begin constituted premeditated misconduct designed to taint the potential jury pool, deny defendants a fair trial, and frustrate the due administration of justice.

 To reiterate, as stated in Grievance Administrator v Fieger, 476 Mich 231, 264-265 n 34; 719 NW2d 123 (2006):
Given the position advanced by the dissenting justices . .. , one wonders whether the dissenting justices would simply surrender the legal process to the least restrained and worst behaved members of the bar. With increasingly little need to adhere to the rules necessary to ensure public confidence in the integrity of the legal process, the dissenters would create a world in which legal questions come increasingly to be decided, not by a fair and rational search for truth, but by bullying and uncivil behavior, personal abuse, one-upmanship, and public exhibitionism on the part of those who are custodians of this system, the bar. Justice under the law cannot flourish within such a system.