# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF GEORGE HEIDT, by BRIAN
HEIDT, Personal Representative,

      Plaintiff-Appellant,

v

ST. JOHN HOSPITAL AND MEDICAL
CENTER,

      Defendant-Appellee,

and

EMERGENCY MEDICINE SPECIALISTS, PC,
SOUTHFIELD RADIOLOGY ASSOCIATES,
PLLC, DON M. BENSON, M.D., DENIS
LINCOLN, M.D., BRIAN PUZSAR, M.D., C.L.,
K.T., J.A., JANE DOE, and JOHN DOE,

      Defendants.

UNPUBLISHED
October 30, 2018

No. 339695
Wayne Circuit Court
LC No. 16-004761-NH

Before: TUKEL, P.J., and BECKERING and SHAPIRO, JJ.

PER CURIAM.

Plaintiff, Estate of George Heidt, appeals the trial court's order granting summary disposition under MCR 2.116(C)(10) (no genuine issues of material fact) to defendant St. John Hospital and Medical Center. We conclude that the trial court erred in ruling that plaintiff failed to establish questions of material fact as to the standard of care, breach, and causation. Accordingly, we reverse and remand.

## I. FACTS

Plaintiff's decedent, George Heidt, died in January 2012, approximately three months after receiving emergency and surgical care at defendant-hospital. According to his wife, Rita, George fell at home on October 15, 2011. After being assisted up, he was able to walk, but was sore. Three days later he was still sore and not feeling better. Rita convinced him to see his primary care physician, and after examining George on October 18, 2011, his physician referred

-1-

him to defendant-hospital for MRI imaging. The emergency room (ER) physicians noted that George had some tingling in one leg and so, concerned about the possibility of spinal compression, ordered an MRI. Rita testified that during the approximately eight hours in defendant's ER prior to being transported to the MRI suite, George was able to walk around the room. Similarly, Jeff Aldis, who transported George to the MRI suite, testified that George was able to get out of his chair on his own power and transfer to a wheelchair for transport.

George had a severe curvature of the spine. According to plaintiff's radiology expert, x-rays demonstrated that George "had almost a 90 degree bend of his lumbar, thoracic and cervical spine," meaning that he was "bent over pretty bad." This condition of leaning forward from scoliosis is called kyphosis.[1] Charles LaFollette, one of the MRI technicians, recalled defendant's posture in the MRI suite as "a little kyphotic" and "a little bent forward." The second MRI technician, Katie Shaw, testified that she did not view George while he was briefly standing and she was unable to discern "if he was hunched." Aldis testified that he recalled George being able to stand up straight. An MRI screening form provided to George asked, "Have you ever had an MRI examination before and had a problem?" George answered "yes" with the following explanation: "had a hard time getting into the machine."

George was eventually supine, i.e., flat on his back, on the MRI table. As will be discussed below, the manner in which he was placed in that position is a disputed question of fact. However, it is not disputed that once he was supine he immediately told the MRI technicians that he had a severe burning pain in his abdomen. They assisted him back to a seated position and he told them that he could no longer feel his legs. The technicians returned George to his wheelchair and Aldis transported him back to the ER for further evaluation.

Rita testified in deposition that when George was returned from the MRI suite he was in pain and very upset. He told Rita that he "couldn't feel his legs, he couldn't move his feet," and that "the rest of me hurts because they repositioned me in a way that was very uncomfortable and very painful." Rita testified that George also told her that he "was very uncomfortable during the MRI, that he was—they pushed, manipulated him into position. . . . Manipulated, flexed—repositioned, I guess is the word I'm looking for, him to be put into an MRI in a way that he was not happy with. It hurt him."

Shaw, Aldis, and LaFollette each testified in deposition. Aldis and LaFollette did not recall how George moved from his seated position on the table to a supine position. Shaw did recall the process and testified that George was able to get onto the table unassisted. As for how he was placed on his back, Shaw testified that she stood at George's feet while either LaFollette or Aldis stood next to him "to help guide from behind." She explained that "there's a 1, 2, 3 count, and then legs are lifted just to the height of the table and smoothly moved and then laid

---

[1] According to the American Academy of Orthopedic Surgery, "Kyphosis is a spinal disorder in which an excessive outward curve of the spine results in an abnormal rounding of the upper back. The condition is sometimes known as 'roundback' or—in the case of a severe curve—as 'hunchback.' " <https://orthoinfo.aaos.org/en/diseases--conditions/kyphosis-roundback-of-the-spine> (accessed October 26, 2018).

back on the table, so it's one fluent [sic] motion." She further explained: "When I'm standing at his feet and then there's someone in front of him and behind him, I would have been supporting his legs, ready to move, everyone else is ready for him to lie back and then all at once he's turned and then reclined. . . . [I]t would have all happened at once . . . ." She could not recall if George was ever completely flat on the table. She wrote a note in the chart immediately after the attempted MRI that George was "unable to lie flat without severe burning pain in abdomen. . . . Also unable to feel feet/legs upon sitting back up."

As noted, Aldis and LaFollette did not recall the process of getting George into a supine position. However, they each offered testimony about their normal procedure for getting patients in position on the table. Aldis testified that "if they can do it on their own power, they do it on their own power; if not than [sic] one person would grab the patient's feet and the other person would help him them [sic] on the side and lift his legs and sit him up and then lay down." He stated that it is usually a two-step procedure in which he and the technicians "get them up and lie them down." He testified that if the patient was having trouble lying down that the staff would offer their arms for the patient to hold onto for support and guidance while the patient lowered him or herself down, but that the technicians would not use force to assist the patient down. LaFollette testified that typically if a patient has difficulty lying back, the technician would grab the patient's forearm and have the patient grab the technician's forearm to help guide the patient down.

After the incident, George underwent emergency neurosurgery in which it was determined that his T-10 vertebra was fractured and that the fracture had displaced so as to cause severe injury to his spinal cord. While the fracture was surgically reduced and fixated during the surgery, the damage to his spinal cord was irreparable. George remained a paraplegic until he died of complications a few months later.

After George's death, his estate filed a complaint against defendant, the MRI technicians, and the named physicians and their professional corporations. The claims against the physicians were ultimately dismissed by stipulation. Following discovery, defendant moved for summary disposition under MCR 2.116(C)(10) on the grounds that plaintiff's experts had offered conflicting and unsupported testimony about the standard of care and had presented speculative theories of causation regarding the remaining defendant MRI technicians. The trial court agreed and granted summary disposition.

## II. STANDARD OF REVIEW

We review de novo a lower court's decision on a motion for summary disposition. See *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A party is entitled to summary disposition if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment . . . as a matter of law." MCR 2.116(C)(10). A genuine issue of material fact exists if, when viewing the record in the light most favorable to the nonmoving party, reasonable minds could differ on the issue. *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 116; 839 NW2d 223 (2013). We review the trial court's decision to exclude evidence for an abuse of discretion. See *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). Questions of law

relating to evidentiary rulings are reviewed de novo. *Elher*, 499 Mich at 21. "The admission or exclusion of evidence because of an erroneous interpretation of law is necessarily an abuse of discretion." *Id*.

## III. ANALYSIS

"The plaintiff in a medical malpractice action bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Cox v Hartman*, 322 Mich App 292, 299; 911 NW2d 219 (2017) (quotation marks and citation omitted). "Generally, expert testimony is required in a malpractice case in order to establish the applicable standard of care and to demonstrate that the professional breached that standard." *Elher*, 499 Mich at 21 (quotation marks and citation omitted). MRE 702 governs the admission of expert testimony:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"MRE 702 incorporates the standards of reliability that the United States Supreme Court established in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), in interpreting the equivalent federal rule of evidence." *People v Muhammad*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 338300); slip op at 4. MCL 600.2955 sets forth factors to consider when the trial court is examining the admissibility of "a scientific opinion" by a qualified expert. MCL 600.2955(1).

## A. STANDARD OF CARE

Plaintiff argues that the trial court erred in disregarding its experts' standard-of-care opinions. We agree.

Plaintiff's primary standard-of-care expert was Darlene Perelka. Perelka testified that she had over 20 years' experience as a radiological technician certified to perform MRIs and defendant did not challenge her qualification as an expert in this field. She opined that the standard of care required that the MRI technicians allow George to lie down by himself instead of manipulating him into a supine position using force. She testified that moving George from a seated position on the table to a supine position in the "one fluid motion" as described by Shaw was a violation of the standard of care which requires that the patient be positioned in a safe and prudent manner rather than with the use of force. She explained that the standard of care required the technicians to "wait[] for Mr. Heidt to be ready to lay down and under his power to lay down." She further stated that when the patient is ready to lie back, it is not a breach to assist the patient by supporting his weight but that it was a breach to "forcibly lay him down." She also stated that with a kyphotic patient the standard of care requires "patience and time to let the patient get acclimated on the table and not [move the patient in] one continuous motion."

Perelka stated that her opinion was supported by the American Registry of Radiologic Technologists (ARRT) Code of Ethics.

The trial court said that it was disregarding Perelka's testimony for two reasons. First, it opined that her standard-of-care testimony conflicted with the testimony of Dr. Ronald Washburn, plaintiff's radiology expert. Dr. Washburn testified that a kyphotic patient should be placed on his side rather than his back when undergoing an MRI. However, neither the trial court nor defendant has explained why a conflict between experts renders either of their opinions inadmissible; no caselaw has been cited to support such a principle. Moreover, Dr. Washburn's testimony was not *materially* inconsistent with Perelka's because he agreed that force should not be used to get a patient into a supine position. Specifically, in his affidavit of merit, Dr. Washburn opined that the standard of care required diagnostic radiologists, "directly or indirectly through their assistants," i.e., MRI technicians, to "refrain from manipulating the decedent's body utilizing excessive force on the spinal column . . . ." This was fully consistent with Perelka's testimony. In other words, the experts disagreed on precisely how to take an MRI of a kyphotic patient. But they agreed that the technicians should not use force to get the patient flat on his or her back, which is what is at issue in this case.

The trial court's second basis for disregarding Perelka's testimony was its conclusion that "Perelka has no scientific basis for her opinion beyond ethic codes that require MRI technicians to exercise caution and care and safety for the patient." Regardless of its admissibility at trial, we see no reason why a code of ethics would be irrelevant to the court's inquiry into the reliability of Perelka's testimony.[2] The ARRT Code of Ethics is relevant to that determination because it supports Perelka's view that "the exercise of caution and care and safety [of] the patient" is part of the technician's duty. The Code provides that "[t]he radiologic technologist assesses situations; exercises care, discretion and judgment; assumes responsibility for professional decisions; and acts in the best interest of the patient."[3] By contrast, defendant's expert's affidavit indicates that the technician's duty is to get the patient lying flat and makes no reference to any duty to do so with care and caution for the patient's safety.[4] Moreover, we do not agree with the trial court's conclusion that it is necessary to have "scientific" support for the principle that MRI technicians should not use physical force to place a kyphotic patient into a supine position. *Daubert* acknowledged that "[s]ome propositions . . . are too particular . . . or of too limited interest to be published." *Daubert*, 509 US at 593. Given that neither party has cited

---

[2] In a legal malpractice action, for example, a violation of the Code of Professional Responsibility "is rebuttable evidence of malpractice." *Lipton v Boesky,* 110 Mich App 589, 597-598; 313 NW2d 163 (1981).

[3] Perelka testified to that specific precept; the ARRT Code of Ethics can be found online. <https://www.arrt.org/docs/default-source/Governing-Documents/code-of-ethics.pdf?sfvrsn=10> (accessed October 26, 2018).

[4] Defendant's expert also stated that if a patient is unable to tolerate a study due to pain, the technicians should consult a physician.

any medical literature on the subject, we conclude that the standard for safely positioning kyphotic MRI patients is one of those propositions.

Further, Perelka was not presenting testimony pertaining to the scientific process. See *Id*. at 590 (determining that that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science."). She did not offer an opinion regarding a novel or complex scientific theory and did not provide a medical opinion regarding the cause of the injury.[5] Her standard-of-care opinion—that a patient with difficulty lying flat should not be placed into that position by the use of physical force, but instead be afforded time and physical support—is grounded in common sense combined with long professional experience rather than controlled studies[6] and publications.

For those reasons, we conclude that Perelka was not rendering a scientific opinion. Accordingly, the factors set forth in MCL 600.2955 were not applicable in this case and the trial court erred in focusing on the lack of a scientific basis for Perelka's opinion. Nonetheless, we note that there was evidence presented from which to conclude that her testimony was "generally accepted within the relevant expert community." MCL 600.2955(1)(c). As noted, Dr. Washburn opined that the standard of care required diagnostic radiologists, either directly or through MRI technicians, to refrain from exercising force on a patient's spinal column. The ARRT Code of Ethics also demonstrates a general acceptance of Perelka's opinion. Further, LaFollette's and Aldis's testimony describing their typical procedure for assisting a patient into a supine position was consistent with Perelka's standard-of-care opinion. They did not express disagreement with that standard as defined by Perelka, but with her assertion that they violated it.[7]

In sum, there was sufficient evidence to establish the reliability of Perelka's standard-of-care opinion. Her opinion was supported by her long professional experience, Dr. Washburn's testimony, the testimony of the defendant's technicians, and the ARRT Code of Ethics. Inconsistencies between Perelka's and Dr. Washburn's testimony may lead the jury to give their testimony diminished weight, but it is not relevant to the admissibility of their opinions. The claimed lack of a scientific basis for Perelka's opinion was also irrelevant because she was not rendering a scientific opinion. Thus, the trial court abused its discretion in disregarding Perelka's testimony.

## B. BREACH

---

[5] We agree with defendant that Perelka is not qualified to testify about causation.

[6] Given the risk to patients, it is unlikely that such studies could be ethically performed.

[7] The trial court also concluded that there was "a question of whether the standard of care requires the MRI technicians to diagnose kyphosis." The trial court is correct that MRI technicians are not required or permitted to diagnose a patient's illness or injury. However, there is evidence that George's kyphosis, or bent spine, was apparent. Regardless of its cause, that abnormality would be relevant to a technician's duty to assess the situation and exercise care and caution for the patient.

We conclude that the court also erred when it determined that there was no evidence to support Perelka's opinion that the MRI technicians breached the standard of care.

A breach is a deviation from the standard of care. See *Martinez v Redform Comm Hosp*, 148 Mich App 221, 230; 384 NW2d 134 (1986). Perelka testified that the technicians breached the standard of care by using force to place George supine rather than allowing him to lie down on his own. The trial court found that Perelka's opinion was "speculative and based on conjecture" because, in the court's view, there was no evidence in the record that the MRI technicians did use force.

A review of the record, however, does provide support for Perelka's conclusion. First, as noted, one of the technicians, Shaw, testified that they actively moved George by lifting his legs, turning him, and laying him on his back all in one motion. Defendant does not explain how those three actions could all occur simultaneously without the use of force.[8] Second, George's own statements to his wife immediately after the incident recounted the use of substantial force by the technicians. Rita testified that George was in pain and very upset when he returned from the MRI. According to Rita's testimony, when George returned he told her that he "couldn't feel his legs, he couldn't move his feet," and he stated that "the rest of me hurts because they repositioned me in a way that was very uncomfortable and very painful." Rita testified that George also told her that "they pushed, manipulated him into position" during the MRI in a way that was hurtful. Certainly the decedent's statement that he was "pushed" and "manipulated" along with Shaw's description of the action is sufficient to provide factual support for Perelka's opinion.

The trial court also erred by giving little or no weight to Rita's testimony, noting that her testimony occurred more than five years after the event and that she had not been in the MRI suite with George. This was plainly a credibility determination, which is a finding of fact; see MCR 2.613(C). The trial court may not find facts or assess credibility when ruling on a motion for summary disposition. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994); *In re Peterson Estate*, 193 Mich App 257, 261; 483 NW2d 624 (1993). Further, "[i]t is for the trier of fact to assess credibility; a jury may choose to credit or discredit any testimony." *Bank of America, NA v Fidel Nat Title Ins Co*, 316 Mich App 480, 512; 892 NW2d 467 (2016). And given that Rita was testifying as to her husband's description of what occurred, the fact that she was not in the MRI suite to personally witness the events is irrelevant. Moreover, the trial court erred by drawing inferences in favor of defendant, the moving party, rather than plaintiff, the nonmoving party. *Dextrom v Wexford Co*, 287 Mich App 406, 415; 789 NW2d 211 (2010).

---

[8] To the degree the court did consider this testimony; it appears to have inferred that the MRI technicians' motions did not involve force. However, when deciding a motion for summary disposition, a court must consider the evidence in the light most favorable to the nonmoving party, *Gorman*, 302 Mich App at 116, and all reasonable inferences are to be drawn in favor of the nonmovant, *Dextrom v Wexford Co*, 287 Mich App 406, 415; 789 NW2d 211 (2010).

On appeal, defendant argues that the trial court's decision to ignore the content of Rita's testimony, even if erroneous, was harmless because the court could have excluded Rita's testimony recounting her husband's statements as hearsay. We disagree. Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). It is generally inadmissible, unless it is subject to a hearsay exception. MRE 802. A hearsay exception exists concerning "[a] statement relating to a starting event or condition made while the declarant was under the stress of excitement caused by the event or condition." MRE 803(2). The trial court may consider indications that the witness was still in shock and under a continuing level of stress. See *People v Smith*, 456 Mich 543, 552-553; 581 NW2d 654 (1998).

Rita testified that her husband was very upset and stressed when he told her what had happened to him in the MRI suite. Indeed, we think it extraordinarily unlikely that the shock and stress of being made paraplegic would dissipate in just a few minutes. Accordingly, Rita's testimony about what George said to her was subject to the excited utterance hearsay exception—it was a statement concerning a startling event or condition, made while George was still under the stress of the event or condition.[9] Given Rita's testimony and Shaw's testimony, the trial court erred in concluding that Perelka's testimony regarding breach was factually unsupported.

## C. CAUSATION

Finally, plaintiff argues that the trial court erred when it determined that plaintiff had presented only speculative evidence concerning causation. Again, we agree.

In a medical malpractice action, proximate cause requires (1) that the negligent conduct was the "but for" cause of plaintiff's injury and (2) that without the conduct, plaintiff's injury would not have occurred. *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 496; 791 NW2d 853 (2010). It is well-established that "the negligence must be 'a proximate cause' not 'the proximate cause.'" *Id*. at 497. In other words, more than one cause may have contributed to a plaintiff's injury. *Id*. at 496-497. A plaintiff can prove factual causation by circumstantial evidence, but the plaintiff's circumstantial evidence "must facilitate reasonable inferences of causation, not mere speculation." *Skinner*, 445 Mich at 163-164. The plaintiff's theory of causation must have some basis in facts from which the jury could conclude that, more likely than not, the plaintiff's injuries would not have occurred but for the defendant's conduct. *Id*. at 164-165. An expert's opinion may be based on well-established physical principles. See *People v Carll*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 336272); slip op at 6 (concerning principles of hydraulics).

In this case, the court stated, "No expert in this case has any evidence beyond conjecture and correlation that what happened—or what the MRI techs did caused plaintiff's injuries." The record does not support this conclusion. Plaintiff's causation experts testified that the MRI

---

[9] It is likely that the statements would also be admissible as a present sense impression, MRE 803(1), and as the decedent's statements regarding his existing physical condition, MRE 803(3).

technicians caused plaintiff's injuries—either by causing the displaced fracture itself, or by displacing a non-displaced fracture. Their testimony was sufficient to create a genuine issue of material fact on the issue of causation.[10]

Plaintiff presented three causation experts: two neurosurgeons, Dr. Mary Edwards-Brown[11] and Dr. Mark Hornyak, and a radiologist, Dr. Washburn. Dr. Edwards-Brown testified that the fracture most likely occurred in the fall and that it was displaced on the MRI table. She explained:

> [I]t seems logical . . . that [the vertebra] broke when he fell. But at that point it was an unstable injury. So you can't call it a stable injury just because he didn't have a spinal cord injury [at that time] . . . . But his soft tissues were holding it more or less in position, and the muscles are holding it in position. And muscles experience pain if they're stretched and if there's a fracture in the vicinity. And so the muscles tend to spasm, tend to hold it.
>
> And—but—when placed in a supine position, the—upper torso, which has some weight behind it, they say the head weighs about like a bowling ball, so that's a fair amount of force, plus shoulders, when tipped into supine position that would likely be enough to cause the fracture to separate and become tragically dislocated, and spinal cord compression.

Dr. Edwards-Brown indicated that the displacement would have been avoided had George attempted to lay down on his own power:

> But were he to try to [lay back] himself without any help, the muscle spasm, which goes along with an acute injury, would tend to hold him until he had enough pain and then he would say "Hey, I can't do that."

* * *

---

[10] The record, at least at this stage of the litigation, does not state defendant's position regarding the cause of George's paralysis.

[11] Defendant argues that the testimony of Dr. Edwards-Brown is not part of the record below because the transcript of that deposition was not provided to the trial court. Dr. Edwards-Brown testified shortly before the motion hearing and the transcript was not yet available. Plaintiff's counsel explained this to the trial court and described the expert's testimony during the hearing. For those reasons, we consider Dr. Edwards-Brown's testimony as part of the record.

It's a self-protective mechanism. Pain stops us from doing things that hurt, hurt a lot. You can push through pain if it's a mild amount, but a large amount of pain is going to stop you.[12]

Dr. Hornyak similarly opined that George came into the ER with a non-displaced fracture caused by his fall three days earlier and that the actions of the MRI technicians caused that fracture to displace, damaging the spinal cord. Dr. Hornyak's opinion that the MRI technicians caused the injury to the spinal cord was based on biomechanical principles, specifically relating to forces that cause particular spinal injuries. He explained that fractures have an axis of rotation, which is "the vector that would be applied relative to the spine and some fulcrum . . . ." In plaintiff's case, Dr. Hornyak testified that the injury was the result of George's body being "rotated posteriorly about an axis of the fracture."

The court stated that Dr. Hornyak's opinion was speculative because the doctor testified that he did not know how the MRI technicians applied force to George. When viewed in context, Dr. Hornyak's testimony does not support this conclusion. First, Dr. Hornyak testified that the imaging studies showed that the injury was an extension injury, i.e., consistent with "excessive force or force" directed at laying George down on his back. He explained that this was demonstrated by the bony fragments of the T-10 vertebra. And while Dr. Hornyak testified that he did not know *exactly* how the force was applied because he was not present in the room, he ruled out the possibility that George's fracture would have displaced merely by lying back under his own power. He concluded instead that the fracture displacement could only have occurred due to a vector of force being applied toward placing George in a supine position.

Dr. Washburn was mostly in agreement with Dr. Hornyak regarding the cause of George's paraplegia. But contrary to Dr. Hornyak, Dr. Washburn opined that the fall at home was unlikely to have caused George's fracture and that the MRI technicians' actions caused the T-10 vertebra to *both* fracture and displace into the spinal cord. The different views of when the fracture initially occurred is not material, however, because the experts agreed that what was relevant for causation was not when the fracture occurred but when and how it became *displaced,* given that a non-displaced fracture would not have caused George's spinal injury and paralysis.

IV. CONCLUSION

In sum, viewing the evidence in a light most favorable to the nonmoving party, plaintiff established questions of fact as to the standard of care, its breach, and the causation of the decedent's paraplegia.

---

[12] This testimony also supports the conclusion that the technicians used force in getting George to a supine position because it indicates that had he done so on his own, the pain would have caused him to sit back up in a self-protective action.

Accordingly, we reverse the grant of summary disposition to defendant and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Jonathan Tukel
/s/ Jane M. Beckering
/s/ Douglas B. Shapiro