*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

K2 RETAIL CONSTRUCTION SERVICES, INC.,

      Plaintiff/Counterdefendant/Cross-
      Defendant-Appellee,

v

WEST LANSING RETAIL DEVELOPMENT, LLC,
WEST LANSING RETAIL DEVELOPMENT II,
LLC, WEST LANSING RETAIL PHASE I, LLC,
K2-LIP JV WEST LANSING, LLC, WL
ACQUISITIONS, LLC, JEROME MASAKOWSKI,
NIKOLAOS MOSCHOURIS, DELTA A3, LLC,
DELTA A7, LLC, and DELTA G1, LLC,

      Defendants/Cross-Defendants-
      Appellants,

and

SOIL AND MATERIALS ENGINEERS, INC., TL
CONTRACTING, INC., CANON FIRE
PROTECTION, LLC, BUILDERS IRON, INC.,
XTREME MASON CONTRACTORS, LLC, and
HELZER & ASSOCIATES, LLC, doing business as
ADVANCED REDEVELOPMENT SOLUTIONS,

      Defendants/Counterplaintiffs/Cross-
      Plaintiffs/Cross-Defendants-
      Appellees,

and

OUTDOOR SPECIALTY, LLC,

      Defendant/Cross-Plaintiff/Cross-
      Defendant-Appellee,

FOR PUBLICATION
February 18, 2025
2:49 PM

No. 367762
Eaton Circuit Court
LC No. 2022-000469-CB

and

SPIRIT REALTY, LP,

           Defendant/Cross-Defendant-Appellee,

and

DELTA CROSSINGS I & II, LLC,

           Intervening Appellee,

and

LANDMARK COMMERCIAL REAL ESTATE
SERVICES, LLC,

           Defendant/Counterdefendant/Cross-
           Defendant,

and

VANDER HYDE MECHANICAL, INC.,
COMMERCIAL INTERIOR CONSTRUCTION,
LLC, and CONSUMERS CREDIT UNION,

           Defendants/Cross-Defendants,

and

MICHIGAN PAVING & MATERIALS CO,
CENTENNIAL ELECTRIC, LLC, RAUHORN
ELECTRIC, INC., WADEL STABILIZATION,
INC., and A&R DEVELOPMENT II, LLC,

           Defendants/Counterplaintiffs/Cross-
           Plaintiffs/Cross-Defendants,

and

CANNON CONCRETE CONSTRUCTION, INC.,
and PEA GROUP,

           Defendants/Cross-Plaintiffs/Cross-
           Defendants,

and

GENE KOHUT, Receiver/Interested Person,

                Defendant.

---

Before:  RIORDAN, P.J., and RICK and N. P. HOOD, JJ.

N. P. HOOD, J.

This appeal involves a foreclosure action under the Construction Lien Act (CLA), MCL 570.1101 *et seq.*, on four properties that are the subject of a planned commercial development project. Plaintiff, K2 Retail Construction Services, Inc. (K2), was the project's general contractor. Defendant, WL Acquisitions, LLC (WLA), was the owner of the properties at the time of the foreclosure. K2 and other lien claimants filed suit against defendants, WLA, West Lansing Retail Development, LLC (WLRD); West Lansing Retail Development II, LLC (WLRD II); West Lansing Retail Phase I, LLC; K2-LIP JV West Lansing, LLC; Jerome Masakowski; Nikolaos Moschouris; Delta A3, LLC; Delta A7, LLC; and Delta G1, LLC (collectively, the WL defendants),[1] in the trial court for the outstanding payment of construction services rendered. The trial court ruled in favor of K2 and some of the other claimants, and K2 proposed a foreclosure sale so that it could purchase the properties at an amount sufficient to pay the other claimants and credit bid its own constructions liens. The trial court approved the proposal. At the foreclosure sale, K2 purchased the properties for approximately $6.6 million. The trial court confirmed the foreclosure sale and shortened the redemption period to two weeks. WLA did not redeem the properties, nor did any of the other WL defendants. K2 transferred the properties from WLA to Delta Crossings I & II, LLC (Delta). On August 30, 2023, the trial court entered an order that vested all rights, title, and interest in the properties in Delta and denied WLA's motion to extend the redemption period for the foreclosed property. The WL defendants claimed this appeal from that August 30, 2023 order.

On appeal, the WL defendants challenge various of the trial court's rulings leading to the foreclosure sale and disbursement of the proceeds. The WL defendants allege that K2 committed various improprieties that warrant vacating a foreclosure sale of properties that are part of a mixed-use development. Intervening appellee, Delta, which has recorded a mortgage against the property,

---

[1] We have simplified the parties' relationships and referred to the collective parties by the names they refer to themselves within their briefs. The parties' full relationships are presented in the caption. WLA is a successor entity of WLRD and WLRD II. WLA purchased from a receiver property formerly owned by WLRD and WLRD II, which formed Phases I and II of a large multiuse development, subject to valid construction liens. Although this development is referred to as Delta Crossings, to avoid confusion with the party Delta Crossings I & II, we will simply refer to it as "the development."

filed a joint appellee brief with K2. Appellee TL Contracting, Inc., opposes the WL defendants' apparent challenge to the trial court's April 25, 2023 order granting summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact) to appellees TL Contracting, Inc; Michigan Paving and Materials Company; Xtreme Mason Contractors; and nonappellees Rauhorn Electric, Inc., and Wadel Stabilization, Inc., on the basis that they had valid construction liens.[2]

As a matter of first impression, we conclude that the WL defendants' failure to redeem the property extinguished their rights related to the property and rendered many of the issues they raise on appeal moot. But the failure to redeem did not render moot the issue of whether the WL defendants (specifically, WLA as the title holder) were entitled to a surplus and the amount of that surplus. Although the trial court did not err by allowing K2 to make a credit bid during the foreclosure sale, the trial court erred by allowing the credit bid without first determining the amount of K2's lien or subsequently resolving the amount of surplus. We reverse the trial court's ruling that it is unnecessary to determine the amount of K2's construction lien and remand to the trial court for the purposes of determining what, if any, surplus resulted from the foreclosure sale. WLA may seek the surplus balance from the foreclosure to the extent any exists. This necessarily requires a finding regarding the amount of K2's lien. In all other aspects, we leave the trial court's rulings undisturbed because WLA's failure to redeem the property renders those issues moot.

## I. BACKGROUND

As stated, this case arises out of WLA's failure to pay construction-lien claimants who ultimately sought and obtained a judgment of foreclosure on the properties comprising the development. K2 purchased the property that formed Phases I and II of the development at the foreclosure auction. The WL defendants allege that K2 committed various improprieties that warrant vacating a foreclosure sale of properties that are part of a mixed-use development.

Several cases exist concerning this development and its investors. Related cases relevant to this appeal include a receivership and auction case related to Phases I and II in the Oakland Circuit Court[3] and a subrogation case related to Phases III to V in the Eaton Circuit Court.[4] There are also other cases between the parties that are not relevant to this appeal.

In 2019, Kris Krstovski, the managing partner of K2, then acting as the manager of WLRD, signed a purchase agreement for a large, multiphase development. At that time, Krstovski was the sole member of WLRD. The development was broken into various phases. Phase I consisted of

---

[2] Additional appellees Canon Fire Protection, LLC, Builders Iron, Inc., and Helzer & Associates, LLC, benefited from the trial court's ultimate distribution order. Only TL Contracting has submitted an appellee brief.

[3] An appeal was filed from an order denying Kris Krstovski's emergency motion to stay a receivership sale in Docket No. 363017, but the appeal was dismissed by stipulation. See *LIP West Lansing LLC v Krstovski*, unpublished order of the Court of Appeals, entered January 30, 2023 (Docket No. 363017).

[4] *West Lansing Retail Dev, LLC v Krstovski*, unpublished per curiam opinion of the Court of Appeals, issued November 9, 2023 (Docket Nos. 365181 and 365183).

25 acres and was to be purchased immediately and used for retail outlets. Phase II consisted of either 25 or 50 acres and was to be purchased within 12 months of Phase I. Phase III was to be purchased within 24 months of Phase I. Phases IV, V, and VI were to be purchased within 36 months of Phase I.

Krstovski is also the managing partner of K2. *West Lansing Retail Development, LLC v Krstovski*, unpublished per curiam opinion of the Court of Appeals, issued November 9, 2023 (Docket Nos. 365181 and 365183), p 1. On May 5, 2022, K2 issued a stop-work order to all subcontractors and vendors. The order included the WLRD Phase I site work and WLRD Phase II site work. The notice informed the contractors that K2 "requir[ed] you to cease all work associated with these projects until further notice."

On April 28, 2022, K2 filed a claim of lien against the various properties.[5] On September 8, 2022, K2 recorded additional liens.[6] Numerous other parties, mainly subcontractors, also recorded liens.

Between 2021 and 2022, the parties filed lawsuits in the Oakland Circuit Court regarding the investment disputes, and a receiver was appointed to take possession of the property of Phases I and II. *West Lansing Retail Dev*, unpub op at 2. WLA purchased Phases I and II from the receiver for $1,050,000. The purchase agreement provided that the purchase was subject to all liens and that "[l]iens and obligations that are valid are to be paid." The Oakland Circuit Court approved the sale of the receivership property. The court ordered "that the sale of Receivership Property to WL Acquisitions is subject to all liens, claims, and encumbrances of any kind whatsoever against the Receivership Property and does not dispose of any claims asserted against the Receivership Property."

Three days after the September 8, 2022 sale, K2 filed a claim of lien for work related to Phases III to V. *West Lansing Retail Dev*, unpub op at 2. WLA missed the purchase agreement's window to purchase an additional phase and indicated that it would not purchase the property with K2's cloud on the title. *Id*. Meanwhile, K2 and WLRD filed lawsuits in which WLRD, in pertinent part, accused K2 of improperly inflating the amount of its construction lien, *id*., which are the lawsuits involved in the present case. Ultimately, K2 moved to subrogate and perform the purchase agreement under the CLA. *West Lansing Retail Dev*, unpub op at 2. Following an evidentiary hearing, the circuit court found that the lien was valid and that the amount of the lien

---

[5] The claim of lien included: $631,926.28 and $168,947.74 against the entire 28-acre parcel containing Unit G1; $3,021,469.38 against the 20-acre parcel containing Unit 4; $31,652.50 against the 28-acre parcel containing Unit A7; $123,464.87 against the 28-acre parcel containing Unit D; and $318,889.06 against the entire 28-acre parcel.

[6] This claim of lien included: $72,580.04, $329,000, and $1,057,369.14 against the entire 28-acre parcel containing Unit G1; $910,891.81 against the entire 28-acre parcel; $30,101.91 against the parcels containing Unit 1 and Unit 4; and $597,714 against the entire parcel. Units A3, A7, and G1 are part of Phase I, and Unit 4 is part of Phase II.

was irrelevant because, if K2 had the right to subrogate, the lien would dissipate when the sale was completed. *Id.*

The subrogation and validity of K2's liens were the subject of the prior appeal. See *id.* WLRD argued that the circuit court was required to determine the actual amount of the lien at the subrogation hearing and argued that it made a prima facie showing that K2's lien was fraudulent and invalid. *Id.* We ultimately agreed with the circuit court that the amount of the lien was irrelevant to the subrogation case because "K2 was not seeking repayment or to foreclose the lien, situations in which K2 could potentially collect funds beyond what it was owed." *Id.* at 7. We agreed with the circuit court that K2 had presented enough evidence that its lien had been calculated in good faith and was not fraudulent. *Id.* Ultimately, we concluded that the circuit court had properly granted K2's motion to subrogate. *Id.* at 10. In other words, in the prior appeal, we decided that K2's liens are valid, but we did not address the question of the amounts of the liens.

On May 10, 2022, K2 filed a complaint against WLA and related entities, which ultimately led to this appeal. K2 alleged that it had performed $975,991.39 of work for WLRD, which it had refused to pay, and $3,3662,127.29 of work for WLRD II, which it also had refused to pay. K2 asserted that it was owed a total of $4,338,118.67 and additional damages. K2 sought foreclosure of its construction liens. Throughout the case, WLA continued to challenge the validity of the liens, i.e., whether the work was actually done. K2 later amended its complaint to include other companies with construction liens, the receiver, and other members of WLA. It argued that WLA, WLRD, and WLRD II had access to $10,000,000 but had refused to pay its debts. K2 raised claims of breach of contract, promissory estoppel, and unjust enrichment against WLRD and WLRD II. It also sought to foreclose the construction lien against WLA, Spirit Realty, and Consumers Credit Union.[7]

During the proceedings, several subcontractors moved for summary disposition. Relevant here, in February 2023, TL Contracting moved for partial summary disposition under MCR 2.116(C)(10), asserting there were no genuine issues of material fact regarding whether it had completed work on Phase I pursuant to subcontracts, for which it had provided notices of furnishing and commencement, as well as a construction lien. It also provided notice of commencement and furnishing related to another subcontract that was part of Phase II. The amounts of its lien were established by undisputed facts through its detailed affidavits and invoices. In response, WLA challenged the validity of the liens and asserted that summary disposition was premature because discovery was ongoing. Other subcontractors also moved for summary disposition. In response to several of these motions, WLA argued that K2 had improperly hired subcontractors without authorization.

In March 2023, WLA moved for approval to sell a portion of one of the subject properties (the 28-acre parcel identified as unit A7) in what it described as an arm's-length negotiation, and put the proceeds in escrow. K2 opposed the sale as not truly being an arm's-length sale. At the hearing on the motion, the trial court repeatedly asked counsel for WLA to answer the court's specific questions, and counsel repeatedly failed to do so. The trial court denied the motion to

---

[7] K2 also sought to void transfers of the property by quitclaim deed from WLA to other entities that WLA and its principals formed. This ultimately lead to a preliminary injunction in K2's favor.

approve the sale because of the court's concerns that it did not appear to be an arm's-length agreement or an agreement made in good faith.

Roughly two weeks after the discovery cut off, on April 25, 2023, the trial court held a hearing on the subcontractors' motions for summary disposition. TL Contracting argued that it had supported the amount and validity of its liens in its motion for summary disposition. It argued, as it argues on appeal, that the dispute between WLA and K2 did not affect the validity of the liens filed by the other claimants. The remaining subcontractor-movants echoed TL Contracting's arguments. WLA disputed that it had not conducted any discovery and asserted that it had 100% of K2's records. WLA believed that K2 had not paid the subcontractors and argued that the WL defendants should not have to pay the liens twice. K2 responded that WLA had not provided any admissible evidence to dispute the amount of the liens when responding to the lien claimants' motions. When the court asked WLA to address the issue, WLA responded that escrow agreements contained money for work that had been done by Michigan Paving and subcontractors. The court then asked TL Contracting which liens it had on the property that were the subject of the motion for summary disposition. Counsel for TL Contracting detailed its liens on Phases I and II, which totaled $1,035,830.70. The trial court asked WLA what evidence it had that TL Contracting had been paid its specific amounts. Although it asserted it had affidavits and sworn statements supporting its position, it was ultimately unable to locate them.

Over the course of the hearing, the trial court had to mute counsel for WLA on at least three occasions. WLA's counsel interrupted other parties. At times, counsel interrupted the trial court, including after the trial court requested that counsel stop doing so. WLA's counsel also ignored questions from the trial court.

Ultimately, the trial court granted the lienholders' motions for summary disposition. Specifically, the court granted summary disposition in favor of TL Contracting, Michigan Paving, Xtreme Mason, Rauhorn Electric, and Wadel Stabilization. It determined that valid construction liens attached to Units A3, A7, and G1 of Phase I and the Unit 4 (the At Home unit) of Phase II.[8]

In April 2024, K2 moved to set a foreclosure sale and reserve price. This followed financial analysis that K2 had previously prepared.[9] K2 moved to foreclose on the property if "one or more of the Lien Claimants are entitled to a construction lien under the CLA." K2 offered to purchase the property at the foreclosure sale for the full amounts due, plus a credit bid for the amount owed

---

[8] Those liens were TL Contracting's liens for $9,004.30, $78,039.25, and $1,035,830.70; Michigan Paving's liens for $151,120.75 and $18,731.50; Xtreme Mason's lien for $589,543.72; Rauhorn Electric's lien for $131,476.64; and Wadel Stabilization's lien for $124,433.

[9] On March 3, 2022, CPA/CFF Jeffrey Buchakjian conducted a financial analysis. The parties referred to this analysis as the "Stout Memo." Buchakjian had been asked to confirm K2 Retail's accounts payable balances owed to WLA. Buchakjian determined that K2 Retail's "accounts payable balance totaled $3,296,888.31" and that the amount was "confirmed appropriate and supported by proper documentation." WLA disputed, and appears to continue to dispute, the analysis and conclusions in that document.

to K2.  Critically, K2 asserted that the trial court did not need to determine the validity of the construction liens to order foreclosure because WLA had not paid any of the lien claimants, and the CLA did not require the trial court to determine the validity of all liens before ordering foreclosure.  Following the foreclosure sale, WLA would be entitled to explain its basis for a proposed distribution.  WLA opposed the motion, arguing that K2 and the subcontractors had misled the court regarding the amounts they were owed.  It also argued that the trial court should not allow a "credit bid" prior to determining whether the lien amounts were correct.  WLA also argued that K2 did not have the right to pay liens from Phase I with the foreclosure of property from Phase II.  WLA also argued that:

> MCL 570.1118(2) requires that the "Court shall . . . determin[e] the amount, if any, due to each lien claimant[.]"[]  This requirement does not go away because of a foreclosure sale.  This is because if there are any surplus proceeds, said proceeds shall be returned to the previous owner of the property.  MCL 570.1121(4).

WLA argued that "a foreclosure sale would potentially result in a surplus which must be returned to WLRD/WLRD II."

The court held a hearing on the motion.  TL Contracting argued for a short redemption period because it had been carrying the unpaid debt for a substantial period of time.  WLA and K2 reiterated their arguments, with K2 acknowledging that credit bids are unusual for construction liens.

The trial court asked whether, if it allowed a credit bid, the amount should be held for K2 and WLA to argue whether the liens were valid.  K2 indicated that, if it was allowed to credit bid, it would pay itself with the funds and waive the liens.  K2 indicated that it had recorded about $6 million in liens but had included its subcontractor liens "to be safe."  K2 had established that it was owed about $3.4 million in liens.  According to K2, if WLA did not redeem the property, the liens would not be an issue, but if WLA redeemed the property, the excess bid could be escrowed and the liens determined.  K2 offered to be allowed to credit bid only $2 million rather than $3.4 million and to have the funds be escrowed.  WLA argued that the WL defendants "just don't think a credit bid in this situation would be proper."

The trial court found that the construction liens recorded by the lien claimants "are valid and attach, at a minimum, to the real properties owned by WLRD and WLRD II . . . ."  The liens were subject to foreclosure, and the court entered foreclosure against the units that had been described.  The trial court found that a reserve price was warranted.  It ordered that a prospective bidder must place a cash bid of $4,450,384.11, plus the amount necessary to pay the court officers' fees.  The court also exercised its equitable powers to find that K2 may place a credit bid of $2 million, "representing [K2's] own construction liens on the Units," and if it did so, K2 waived any claim to additional amounts.  The credit bid was to be part of the redemption price.  The court declined to make any rulings regarding the parties' claims or defenses related to K2's construction liens.  If WLA redeemed, the cash of K2's credit bid would be held by the court for subsequent distribution after adjudication of the dispute between K2 and the WL defendants regarding the validity of K2's liens.  The court set a redemption period of two weeks.

-8-

The properties (Units A.3 of Phase I, A.7 of Phase I, G.1 of Phase 1, and Unit 4 of Phase 2) were initially noticed for a public sale on June 15, 2023, with the sale to occur on June 26, 2023. The sale was adjourned to July 12, 2023. The ultimate sale terms were provided as follows:

> **SALE TERMS**: All bidders must register with the Court Officer/ Deputy Sheriff, no later than 4:00 P.M. on July 11, 2023. All bidders must bring proof of funds showing they can place a cash bid in an amount no less than $4,450,384.11. **All bidders must also bring a cashier's check to the sale in the amount of $134,271.52 made payable to Court Service Agency to participate in the sale.** Full payment of the $4,450,384.11 minimum cash bid, plus any additional cash amounts bid at the sale, shall be paid within three days or the sale via a mutually agreed payment method. The Court Officer/ Deputy Sheriff has the right to accept or reject any bid and to hold or adjourn this sale. All sales are subject to all seizure costs, including, but not limited to, Deputy Sheriff/ Court Officer fees, levy costs, and sale fees. All items are subject to any lien and secured interests. All sales are final and sold "as is" and no warranty is expressed or implied.

WLA filed an emergency motion to adjourn the foreclosure sale on the basis of defective notice, which the trial court denied.

The foreclosure sale was on July 12, 2023, as noticed. The auctioneer's affidavit indicated that Delta made the highest bid for a sum of $6,644,655.63. The sheriff's deed was issued on August 14, 2023. Delta's attorney later averred that K2 had been the prevailing bidder, and Delta merely provided financial support for K2's bid. K2 had then directed the sheriff's deed to be granted to Delta.

On July 14, 2023, during the redemption period, K2 and Delta executed a future advance mortgage for $4,644,655.63. The real estate to be mortgaged was Units A.3, A.7, and G.1 of Phase I, as well as Unit 4 of Phase II. The security interest for the mortgage was "the sheriff's deed granted to [K2] in connection with that certain foreclosure sale of Property conducted on July 12, 2023."

On July 24, 2023, K2 moved to confirm the foreclosure sale, asserting that it had placed a cash bid of the reserve price and a credit bid of $2 million, resulting in a total bid of $6,642,215.39. WLA responded that K2 had not proved the amounts of its construction liens and requested that, if the property was not redeemed, that "title to property would transfer to K2 in accordance with this Court's order; but K2 will still have to substantiate at least $2,000,000 of its liens." WLA clarified that it was not arguing that the foreclosure sale would be voided, merely that it was seeking the surplus proceeds. WLA also argued that, because K2 had used a credit bid as if it were a cash bid, it should be prohibited from transferring the property without depositing funds with the court. It asked for an evidentiary hearing on this issue.

At the hearing, TL Contracting indicated that, regardless of whether the property was redeemed, the creditors would be paid because the money would stay with the court until it was disbursed. WLA agreed that the lien claimants and creditors could be paid.

In its written order, the court held that the foreclosure sale had occurred on July 12, 2023, at which K2 had placed a cash bid of the reserve price plus a credit bid of $2,000,000, resulting in a total sale price of $6,644,655.63. K2 was declared the prevailing bidder and paid the court officer the cash bid of the sale. The court confirmed the foreclosure on the basis that it had been consistent with the court's foreclosure order and the CLA. It ordered that "[t]he court officer shall issue a sheriff's deed transferring title to the Foreclosed Properties as K2 may direct," that the sale proceeds be deposited until the court could order them distributed under the CLA, and a two-week redemption period. The court ordered that the redemption price was $6,644,655.63, plus statutory interest. Further,

> in the event of a redemption the $2,000,000.00 in cash proceeds paid by the Owners in connection with K2's credit bid shall be deposited with the Court for subsequent distribution in accordance with the adjudication or other disposition of the dispute between K2 and the Owners as to the validity and amount of K2's liens and entitlement to those credit bid proceeds[.]"

In a separate order directing disbursement of the foreclosure-sale proceeds, the trial court ordered that the approximately $4.5 million of funds received from the foreclosure sale should be disbursed to the creditors. The court ordered that, 60 days after the entry of the order, any undisbursed amounts were to be considered surplus proceeds. "Any claims to the Surplus Balance may be addressed by motion of any party claiming an interest in the Surplus Balance."

WLA then moved for "declaratory relief," which the trial court denied, concluding that it was actually a motion for reconsideration of the court's order confirming the foreclosure sale. The court opined that WLA had not demonstrated a palpable error by which the court had been misled because it had already rejected WLA's argument that it would be entitled to the surplus value of an auction to the extent that it exceeded valid liens and that K2's credit bid would have to be litigated.

The last date to redeem the property was August 14, 2023. On August 7, 2023, WLA moved to extend the redemption period. It argued that K2 had improperly mortgaged the property. That same day, counsel for Delta e-mailed counsel for WLA to inform him that, if the property was timely redeemed, the mortgage would be discharged. On August 9, 2023, David L. Morrison, the Senior Vice President of Citizens Bank, provided Masakowski with a letter indicating that the bank was unable to approve Masakowski's request for a loan of $4,800,000.

The trial court held a hearing on the motion on August 30, 2023. Following the hearing, the trial court opined that K2 had bid on the property, had been awarded the property, had mortgaged the property with an assignment of collateral to Delta, and then had requested that the sheriff's deed be placed in the name of Delta. The court opined that WLA had not provided any law to support its argument that the procedure had been illegal or improper, and therefore, it denied WLA's motion to extend the redemption period.

After the hearing, the trial court entered an order denying WLA's motion to extend the redemption period for the reasons stated on the record, namely that WLA failed to redeem the property. The court further ordered that "the redemption period has expired," and WLA's rights, title, and interest in the properties were extinguished. The court determined that the mortgage

recorded by Delta "did not cloud the Owners' title and/or impair the Owners' ability to exercise their redemption rights in the Foreclosed Properties[.]" The trial court also denied WLA's motion for injunctive relief.

This appeal followed. During the pendency of this appeal, K2 twice moved to dismiss this case as moot. Less than a month after appellants filed this appeal, K2 moved to dismiss the appeal, contending that appellants' failure to redeem the properties extinguished their property rights and rendered any appeal from the foreclosure action moot. We denied the motion to dismiss, providing in part that it could not "reasonably make a determination that this appeal is moot before appellants' brief on appeal has even been filed." *K2 Retail Constr Servs v West Lansing Retail Dev*, unpublished order of the Court of Appeals, entered October 20, 2023 (Docket No. 367762). On April 9, 2024, briefing for this appeal concluded. Subsequently, K2 and Delta filed another motion to dismiss with a motion for immediate consideration. Another panel of this Court declined to dismiss the case without prejudice to this panel and our ability to determine the issue. *K2 Retail Constr Servs v West Lansing Retail Dev*, unpublished order of the Court of Appeals, entered May 29, 2024 (Docket No. 367762). In its brief on appeal, K2 reiterated its argument that WLA's failure to redeem the property renders the issues on appeal moot.

## II. MOOTNESS

As a preliminary issue, K2 argues, as it did in its motion to dismiss, that WLA's failure to redeem the property within the redemption period renders this case moot. We observe that most of WLA's substantive arguments are tied to the central question of whether we can grant any relief. We largely agree with K2 that WLA's failure to redeem within the redemption period renders this case moot, with the exception of the WLA's argument regarding the trial court's responsibility to determine the amount of a surplus (if any).

This is a matter of first impression. There is presently no caselaw under the CLA that directly addresses whether the failure of a property owner to redeem a property during the redemption period renders an appeal from the construction lien foreclosure action moot. In other contexts, we have held that a property owner's failure to redeem a property in a foreclosure action renders subsequent appeals moot. See, e.g., *Bryan v JPMorgan Chase Bank*, 304 Mich App 708, 710; 848 NW2d 482 (2014) (in the context of a foreclosure by advertisement, the mortgagor lacked standing after failing to redeem the property during the statutory redemption period); *Can IV Packard Square, LLC v Packard Square, LLC*, 328 Mich App 656, 658, 661-666; 939 NW2d 454 (2019) (in the context of a judicial foreclosure, the mortgagor lacked standing after failing to redeem the property during the statutory redemption period). We now extend those principles to foreclosure actions under the CLA.

We address mootness as a preliminary matter before reaching any substantive issues because we will decline to consider a case, or issues within a case, that we have no power to determine. *Equity Funding, Inc v Milford*, 342 Mich App 342, 348-349; 994 NW2d 859 (2022). We review de novo whether an issue is moot and whether a party has standing. *Can IV Packard Square, LLC*, 328 Mich App at 658.

An element of the authority granted to courts under Article VI of the Michigan Constitution is that courts will not reach moot issues. *In re Smith*, 335 Mich App 514, 519; 967 NW2d 857

(2021). An issue is moot when this Court's decision can have no practical effect on a controversy or it is impossible for this Court to fashion a remedy. *Garrett v Washington*, 314 Mich App 436, 449; 886 NW2d 762 (2016).

Although we have not previously addressed whether a failure to redeem renders an appeal of a construction lien foreclosure action moot, we have held that the failure to redeem renders an appeal moot in the context of other types of foreclosures. See, e.g., *Bryan* , 304 Mich App at 710. For example, in *Bryan v JP Morgan Chase Bank*, we held that the plaintiff-mortgagor lacked standing to bring a quiet-title action after the statutory redemption period expired without the plaintiff redeeming the property. *Id.* There, the plaintiff's case involved a foreclosure by advertisement. *Id.* at 710-711. We held that a mortgagor's failure to redeem the property extinguished the mortgagor's rights in relation to the property. *Id*. at 713. We reasoned that MCL 600.3236 states, in pertinent part:

> Unless the premises described in such deed shall be redeemed within the time limited for such redemption as hereinafter provided, such deed shall thereupon become operative, and shall vest in the grantee therein named, his heirs or assigns, all the right, title, and interest which the mortgagor had at the time of the execution of the mortgage, or at any time thereafter. [*Bryan*, 304 Mich App at 713 (quotation marks omitted).]

The plaintiff failed to redeem the property. *Id*. at 712. As a result, the plaintiff lacked standing to bring a claim regarding the property, including challenges to whether the defendant held the indebtedness that led to the foreclosure. *Id*.

Likewise, in *Can IV Packard Square, LLC*, 328 Mich App at 658, we held that the defendant's failure to redeem property as provided in MCL 600.3140 rendered the defendant's appeal moot. The case involved a judicial judgment of foreclosure. *Id*. We noted that MCL 600.3130(1) states, in pertinent part, that if the property is not redeemed during the redemption period,

> the deed shall become operative as to all parcels not redeemed, and shall vest in the grantee named in the deed, his heirs, or assigns all the right, title, and interest which the mortgagor had at the time of the execution of the mortgage or at any time thereafter. [*Can IV Packard Square, LLC*, 328 Mich App at 662 (quotation marks omitted).]

We compared the language of statutes relevant to foreclosures by advertisement and judicial foreclosures. *Id*. at 664. We noted that both types of foreclosure set a redemption period. *Id*. Both types of foreclosure contain language providing that, if the property is not redeemed, title vests in the grantee. *Id*. at 664-665. We concluded that, "[c]omparing the statutory language in MCL 600.3130(1) with the language in MCL 600.3236, it is plain that the Legislature intended that, in both circumstances, a mortgagor would have a set period of time to redeem the property and that the failure to do so would result in the extinguishment of the mortgagor's rights in and to the property." *Id*. at 665.

A foreclosure under the CLA is different from a foreclosure by advertisement—the issue in *Bryan*—or a judicial foreclosure—the issue in *Can IV Packard Square*. Most critically, the CLA does not give the owner a set statutory period of time to redeem the property. Instead, the CLA requires the trial court to "fix a period for redemption," which "shall not exceed 4 months." MCL 570.1121(3). For this reason, our reasoning in *Can IV Packard Square* does not directly apply to foreclosures under the CLA. But it is illuminating.

And there are many similarities. The statutory language vesting title of the property in the grantee of the sheriff's deed is the same. Compare MCL 570.1121(3) with MCL 600.3130(1) and MCL 600.3236. The Legislature's use of identical language in different parts of the same act indicates a legislative intent to construe language identically. See *Can IV Packard Square*, 328 Mich App at 665. "Statutes that relate to the same subject or that share a common purpose are *in pari materia* and must be read together as one law, even if they contain no reference to one another and were enacted on different dates." *O'Connell v Dir of Elections*, 316 Mich App 91, 99; 891 NW2d 240 (2016) (quotation marks and citation omitted). The CLA provides that:

> the foreclosure, upon becoming final, shall vest in the grantee named in the deed all the right, title, and interest in the real property which the owner, co-owner, lessee, or co-lessee whose interest is being foreclosed had at the date of the execution of the contract or at any time thereafter. [MCL 570.1121(3).]

These are the same interests vested in a grantee under MCL 600.3236 and MCL 600.3130(1). Although judicial foreclosures and foreclosures by advertisement are governed by the Revised Judicature Act (RJA), MCL 600.101 *et seq*., and the foreclosure at issue in this case is governed by the CLA, we discern no basis to treat the effect of foreclosure under the CLA differently than foreclosures under the RJA. All of these foreclosure statutes contain the same language vesting rights, title, and interest in the grantee of the resulting deed. Accordingly, to the extent that WLA seeks to set aside the foreclosure sale, we conclude that WLA's appeal is moot.

We cannot grant WLA the relief it seeks. That is true for WLA's argument to set aside the foreclosure sale and disbursement based on a purportedly improper credit bid.[10] It is true for WLA's argument to set aside the sale and disbursement based on purportedly defective foreclosure notice.[11] It also applies to WLA's argument that K2 purportedly improperly placed a mortgage on

---

[10] To the extent the validity of a credit bid implicates the question of a remaining surplus, we address this issue later. To the extent that challenging the validity of the credit bid is an attack on the validity of the sale or disbursement, we are not empowered to address it because it is moot.

[11] This issue is moot because WLA no longer has an interest in the property that was the subject of the foreclosure-sale notice. Even if this issue is not moot, WLA has abandoned this argument by failing to support it. A party abandons an issue by failing to sufficiently brief an issue on appeal. *Tyra v Organ Procurement Agency of Mich*, 498 Mich 68, 88; 869 NW2d 213 (2015). WLA has provided no authority to support its position that the foreclosure notice was required to include that K2 Retail was permitted to place a credit bid. The foreclosure sale in this case was a sale of real estate ordered pursuant to a judgment. A notice of a foreclosure by advertisement must include notice of the time and place of the sale and a description of the real estate to be sold. See

the property when WLA was still a fee owner or improper purchase by Delta, not K2.[12]  Finally, it applies to WLA's argument regarding K2's authority to contract for work, and accordingly, to create valid subcontractor liens.[13]

But, contrary to K2's argument, setting aside the foreclosure sale is not the only relief that WLA seeks.  In its request for relief, WLA asserts that it was "deprived of due process protections," and that the failure to adjudicate the construction liens "stripped WLA of its property[.]"  WLA specifically raises an issue concerning whether it is entitled to any surplus proceeds from the foreclosure sale, and argues that the surplus proceeds of a foreclosure sale are the property of the previous owner.  As discussed later in Part IV, the CLA explicitly provides that the owner of a property that has been foreclosed upon has the right to seek any surplus proceeds of the sale.  See MCL 570.1121(4).  Because it is not impossible for us to grant WLA some of the relief it seeks, we do not conclude that WLA's entire appeal is moot.  The issue of WLA's entitlement to a surplus is still a live issue.

---

MCL 600.6052.  This statutory section does not require notice of the terms of the sale, including the existence of a reserve price or any party's ability to place a credit bid.

[12] This issue is moot because WLA no longer has any rights, title, or interest to the property on which the mortgage was recorded.  Even if it were not moot, WLA waived this issue.  In a motion for injunctive relief, WLA initially preserved this issue by asserting that it was unable to redeem the property because K2 had clouded the title of the property by recording a mortgage before K2 owned the property.  But WLA subsequently waived this issue.  A waiver is a voluntary, intentional abandonment of a known right.  *Quality Prod & Concepts Co*, 469 Mich 362, 374; 666 NW2d 251 (2003).  An affirmative expression of assent is a waiver.  *Id*. at 378.  Further, a party may not take a position before this Court that is contrary to a position the party took before the lower court.  *Braverman v Granger*, 303 Mich App 587, 608; 844 NW2d 485 (2014).  Additionally, a party may not appeal an error that the party created.  *Clohset v No Name Corp*, 302 Mich App 550, 555; 840 NW2d 375 (2013).

Here, WLA acknowledged that "we could redeem the property.  But, who wants to redeem a property that has an improper mortgage put on it?"  WLA also expressly asserted that, if it did not redeem the property, title of the property would transfer to K2 and that WLA was not arguing that the foreclosure sale should be voided.  WLA's assertions before the trial court are directly contrary to its assertion that an improper mortgage affected its title and prevented it from redeeming the property.  If the issue were not moot, it would be waived.

[13] Again, this issue is moot because WLA no longer has rights, title, or interest related to the property to which the construction liens attached.  We nonetheless observe that the subcontractors at issue—specifically TL Contracting—provided evidence of contracts, sworn statements, and notices of furnishing.  In contrast, WLA provided no documentary evidence regarding the absence of contracts, sworn statements, or notices of furnishing.  WLA has not provided any argument or authority to support its argument that K2 must have had the authority to hire subcontractors in order for those subcontractors' properly-noticed liens to be valid.

-14-

## III. CREDIT BID

WLA's primary argument is that the trial court should not have allowed K2 to make a credit bid at the foreclosure sale of WLA's property. Credit bids are common in judicial foreclosures and foreclosures by advertisement. But WLA argues that foreclosures under the CLA can involve a disputed lien amount, so credit bids should not be allowed. We disagree for three reasons.[14] First, the CLA contemplates credit bids related to receivership foreclosures, and there is no reason not to apply the same provision, MCL 570.1123(3), to judicial foreclosures. Second, to prohibit credit bids would undermine the function of the statute. Third, credit bids are allowed in other related contexts, and we see no reason why they should not apply here.

"A construction lien is a security interest that a participant on a construction project takes in real property as security for their payment expectations." *Legacy Custom Builders, Inc v Rogers*, 345 Mich App 514, 522, 8 NW3d 207 (2023), citing MCL 570.1103; MCL 570.1107(1). Construction liens are governed by the CLA. *Legacy Custom Builders, Inc*, 345 Mich App at 522. " 'Construction lien' means the lien of a contractor, subcontractor, supplier, or laborer, as described in MCL 570.1107." *Legacy Custom Builders, Inc*, 345 Mich App at 522, quoting MCL 570.1103(3) (brackets omitted). MCL 570.1107(1) states, in relevant part:

> Each contractor, subcontractor, supplier, or laborer who provides an improvement to real property has a construction lien upon the interest of the owner or lessee who contracted for the improvement to the real property, . . . the interest of an owner who has subordinated his or her interest to the mortgage for the improvement of the real property, and the interest of an owner who has required the improvement.

"The CLA is intended to protect the interests of contractors, workers, and suppliers through construction liens, while protecting owners from excessive costs." *Ronnisch Constr Group, Inc v Lofts on the Nine, LLC*, 499 Mich 544, 552; 886 NW2d 113 (2016). "This act is declared to be a remedial statute, and shall be liberally construed to secure the beneficial results, intents, and purposes of this act." MCL 570.1302. The CLA provides that contractors and subcontractors who provide improvements to real property as described in a notice of commencement acquire a construction lien. MCL 570.1107(1). The lien "attaches to the entire interest of the owner or lessee who contracted for the improvement, including any subsequently acquired legal or equitable interest." MCL 570.1107(2). If a court finds that a lien claimant has not been paid, "the court may enter a judgment ordering the sale of any interest in the real property, or a part of the real property, to which the construction lien attaches." MCL 570.1121(1).

---

[14] We review de novo questions of statutory interpretation. *Ronnisch Constr Group, Inc v Lofts on the Nine, LLC*, 499 Mich 544, 552; 886 NW2d 113 (2016). When doing so, our "goal is to give effect to the Legislature's intent, focusing first on the statute's plain language." *Id*. We examine the statute as a whole, reads words and phrases in context of the entire legislative scheme, and enforces unambiguous statutes as written. *Id*. We review de novo the trial court's equitable actions. *McFerren v B & B Inv Group*, 253 Mich App 517, 522; 655 NW2d 779 (2002). Under de novo review, we review legal issues independently, without deference to the lower court. *Wright v Genesee Co*, 504 Mich 410, 417; 934 NW2d 805 (2019).

Regarding foreclosures, the CLA provides that "[a]n action to enforce a construction lien through foreclosure is equitable in nature." MCL 570.1118(1). It is possible that not all claims of lien will be known at the time of a foreclosure sale:

> If all claims of lien are not ascertained when a sale is ordered, or if for any other reason it is deemed proper to postpone the order of distribution of the proceeds of a sale on foreclosure, the court may direct the party making the sale to bring the proceeds of the sale into court, to be disposed of according to order of the court. [MCL 570.1121(5).]

"A court acting in equity looks at the whole situation and grants or withholds relief as good conscience dictates." *McFerren v B & B Inv Group*, 253 Mich App 517, 522; 655 NW2d 779 (2002). A credit bid occurs when a secured creditor uses their claim against a debtor to bid on the debtor's collateral in an auction. See *Bank of America, NA v First American Title Ins Co*, 499 Mich 74, 88; 878 NW2d 816 (2016) (concerning foreclosure by a mortgagee). Put differently, a credit bid involves a party making a bid on the basis of cash that would otherwise be returned to it. See *id.* In the context of a foreclosure by advertisement, a mortgagee may make "a full credit bid," which is "equal to the unpaid principal and interest of the mortgage debt, together with costs, fees, and other expenses of the foreclosure." *Id*. at 88. From a utility standpoint, allowing a full credit bid prevents the lender from arguing that the property was worth more than the lender bid and then pursuing a deficiency judgment against the borrower. See *id*. at 89. Similarly, although the CLA does not explicitly provide for credit bids, we observed that the CLA does contemplate deficiency judgments. See MCL 570.1121(4).

Considering that enforcing a construction lien through foreclosure is equitable, see MCL 570.1118(1), it is reasonable for a trial court to allow a lien claimant to add to its bid at a foreclosure any amounts that would be owed to the claimant as a result of the foreclosure. To hold otherwise, which is to say, to require the bidder to pay to the court officer money that would simply be given back to the bidder after the foreclosure, would be a waste of time and resources. It would also potentially prevent some cash-strapped lien claimants from enforcing their liens through foreclosure unless they have the liquid resources to pay in what they claim to be owed.[15]

Further, the CLA already contemplates what could be considered a credit bid in the context of receivership foreclosures. The CLA states that:

> [a]ny lien claimant or mortgagee may purchase the real property at a sale on foreclosure or a sale by the receiver, and *may apply on the purchase price any sums which would be payable to him or her from the proceeds of the sale*. [MCL 570.1123(3) (emphasis added).]

MCL 570.1123(3) does not directly apply to a foreclosure sale pursuant to a judgment of foreclosure. We examine statutory words and phrases in context. *Ronnisch Constr Group*, 499 Mich at 552. The context of MCL 570.1123(2) concerns the authority of a receiver. See MCL

---

[15] We acknowledge that this begs the question: whether the court should have allowed a credit bid when the amount of money owed to the claimant is unknown. We discuss that issue in Part IV.

570.1123(1) (a receiver may petition to complete construction). See also MCL 570.1123(2) (a receiver may petition to sell the property); MCL 570.1123(4) (the effect of the foreclosure after a sale by a receiver). But the CLA does not explicitly prohibit credit bids at a judicial foreclosure. And this provision supports a conclusion that credit bids are not entirely precluded by the CLA.

## IV. SURPLUS AND THE REQUIREMENT TO RESOLVE THE DISPUTED LIEN AMOUNT

Closely related to the argument addressed in Part III, WLA argues that the trial court should not have permitted K2 to make a credit bid without first determining the amount of K2's lien. By extension, it argues that the trial court effectively prevented WLA from seeking any potential surplus proceeds from the foreclosure sale because it is unknown what, if any, surplus exists. As discussed, we conclude that the trial court properly permitted K2 to make a credit bid. But it was an error to allow the credit bid without first determining the amount of K2's lien or subsequently determining it. Without that finding, the trial court's decision deprived WLA of its right to seek surplus proceeds from the foreclosure sale. We reverse the trial court to the extent that it found it unnecessary to determine the amount of K2's lien. We remand for the trial court to determine whether there is a surplus and make determinations about its distribution.[16]

In an action to enforce a construction lien through foreclosure, the CLA requires the trial court to determine the amount due to each claimant:

> In an action to enforce a construction lien through foreclosure, the court shall examine each claim and defense that is presented and determine the amount, if any, due to each lien claimant or to any mortgagee or holder of an encumbrance and their respective priorities . . . . [MCL 570.1118(2).]

The Legislature's choice to use the word "may" ordinarily indicates a permissive provision and the word "shall" indicates a mandatory provision. See *True Care Physical Therapy, PLLC v Auto Club Group Ins Co*, 347 Mich App 168, 182; 14 NW3d 456 (2023). The CLA accordingly mandates the trial court to determine the amount of each claim. See MCL 570.1118(2).

Here, however, in its June 2, 2023 order granting the motions to set the foreclosure sale and reserve price, as well as entering a judgment of foreclosure, the trial court expressly declined to make any rulings regarding the parties' claims or defenses related to K2's construction liens unless WLA redeemed the property. The trial court's ruling that "if the property is not redeemed, there is nothing else to litigate" was incorrect. If there was a surplus from the foreclosure sale, WLA would be entitled to it. See MCL 570.1121(4). The court erred by not determining the amount owed to each lien claimant in this action.[17]

---

[16] We review de novo questions of statutory interpretation. *Ronnisch Constr Group*, 499 Mich at 552. We also review de novo the trial court's equitable actions. *McFerren*, 253 Mich App at 522.

[17] K2 argues that the trial court need not determine the amount of all claims of lien before ordering foreclosure. But this argument fails because, even though it is true, the statutory section on which

The trial court's failure to follow MCL 570.1118(2) and examine each claim and determine the amount due to each claimant, including K2, may have vindicated K2's (and other lien claimants') rights, but it created an unresolved issue regarding WLA's entitlement to surplus proceeds under MCL 570.1121(4). WLA is statutorily entitled to seek the surplus proceeds of any foreclosure sale:

> After the making of all payments directed by the court, any surplus from the proceeds of the sale of property on the foreclosure of a construction lien under this act shall be paid over to the owner, co-owner, lessee, co-lessee, or such other person as may be entitled to the surplus. However, the surplus shall be subject to a subsequent judgment or execution under this act in the same manner as if the surplus was derived from a sale made under the subsequent execution. [MCL 570.1121(4).]

Without making the required findings under MCL 570.1118(2), it could not determine whether and to what extent WLA could recover surplus proceeds under MCL 570.1121(4).

Here, the property was sold at the foreclosure sale for $6,644,655.63. But in the disbursement order, the trial court directed that only $4.5 million of the funds received from the foreclosure sale would be disbursed. The trial court ordered that, 60 days after entry of the order, any undisbursed amounts were to be considered surplus proceeds, and "[a]ny claims to the Surplus Balance may be addressed by motion of any party claiming an interest in the Surplus Balance." By the trial court's definitions, $2 million of the sale proceeds cannot be part of a surplus balance and are not distributed as part of the payments directed by the court. Therefore, under these facts, if WLA is correct that K2 was not owed any construction liens, then WLA would have no ability to seek the potential $2 million in surplus funds of a judgment of foreclosure. In the subrogation case that was the subject of the parties' prior appeal, we acknowledged that, had K2 sought to foreclose upon its liens, it could potentially collect funds beyond that it was owed. *West Lansing Retail Dev*, unpub op at 7. WLA's inability to seek the potential surplus proceeds of the foreclosure sale is the situation that we predicted. See *id.*

---

K2 relies, MCL 570.1121(5), does not create an exception to the trial court's duty to determine how much was owed to each lien claimant, see MCL 570.1118(2).

> The CLA allows the court to order foreclosure before determining the validity of all liens:
>
> > If all claims of lien are not ascertained when a sale is ordered, or if for any other reason it is deemed proper to postpone the order of distribution of the proceeds of a sale on foreclosure, the court may direct the party making the sale to bring the proceeds of the sale into court, to be disposed of according to order of the court. [MCL 570.1121(5).]

This language does not contain any exception to the requirement of MCL 570.1118(2) that the trial court determine the amount owed to each lien claimant. It simply allows the trial court to do so *after* ordering a foreclosure sale.

K2 argues that it already proved that it was owed at least $3.3 million and that WLA would be unable to challenge the propriety of its lien because it conducted no discovery. If that were the case, then the error (if any) of failing to calculate the surplus would be harmless. We will not modify a decision of the trial court on the basis of a harmless error. MCR 2.613(A). An error is harmless if it was not decisive to the outcome of the case. *Ellison v Dep't of State*, 320 Mich App 169, 179; 906 NW2d 221 (2017). The problem is, right now, based on the record before us, it is not clear.

Here, the discovery deadline passed on April 10, 2023, and there is no indication that WLA conducted discovery in this case. In contrast, K2 provided documentary evidence indicating that K2's "accounts payable balance totaled $3,296,888.31" and, according to what the parties referred to as the Stout Memo, that the amount was "confirmed appropriate and supported by proper documentation." Although the trial court explicitly declined to make any rulings regarding the parties' claims or defenses related to K2's construction liens unless the property was redeemed, it later noted in its August 7, 2023 order denying WLA's motion for declaratory relief that K2's liens totaled more than $3 million. If the court's statement in the August 2023 order was a finding that K2 was owed more than $3 million in construction liens, then the court's error in failing to determine the amount of K2's construction liens or excluding the potential $2 million from the surplus proceeds that could be claimed in this case would be harmless because WLA would be unable to establish that there were any surplus proceeds.

We therefore remand to the trial court to clarify its findings and conclusions in order to determine whether a surplus exists and whether WLA is entitled to any proceeds. The trial court may hold an evidentiary hearing to accomplish this. Or it may decide on the existing record. We acknowledge the very real possibility that there was no surplus. But the trial court is in the best position to make that determination. And the CLA requires it to do so.

## V. ALLEGED DUE-PROCESS VIOLATION

Finally, WLA argues that it was deprived of its opportunity to be heard because counsel was repeatedly muted during hearings. WLA's argument lacks merit because the trial court has inherent authority to control the proceedings before it, and WLA has not demonstrated that it was denied the opportunity to be heard.

The Michigan and United States Constitutions provide, in part, that no person shall be deprived of property without due process of law. US Const, Am XIV; Const 1963, art 1, § 17. The essential purpose of due process is to ensure fundamental fairness. *Al-Maliki v LaGrant*, 286 Mich App 483, 485; 781 NW2d 853 (2009). Due process requires that a party receive notice of the proceedings against it and a meaningful opportunity to be heard. *Id*. However, "an oral hearing is not necessary to provide a meaningful opportunity to be heard." *In re BGP*, 320 Mich App 338, 344; 906 NW2d 228 (2017) (citation omitted).

Further, trial courts have the "authority to direct and control the proceedings before them." *Maldonado v Ford Motor Co*, 476 Mich 372, 376; 719 NW2d 809 (2006). This authority extends to rules governing court proceedings and the authority to enforce those rules. *Id*. "At the heart of preserving an organized polity, we must attend to relevant issues, including concerns over belligerent, antagonistic, or incompetent lawyering." *Id*. The court's inherent authority to sanction

litigants and counsel arises from "the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id*. at 376.

Here, during hearings, counsel repeatedly gave nonresponsive answers to the trial court's direct questions. Counsel interrupted the court, including after the court asked counsel to stop speaking. Counsel interrupted other counsel when the court was addressing other counsel. As a result, the court ordered that WLA's counsel be muted. However, counsel was unmuted for the trial court to allow counsel to address issues.

The trial court did not violate WLA's right to due process by maintaining control over the proceedings with the mild sanction of ordering WLA's counsel to be muted at times during the oral hearings. WLA was not entitled to an oral hearing, and even though it was given an oral hearing, counsel was not entitled to avoid any consequences for belligerent conduct. The court repeatedly warned counsel about counsel's conduct. Further, regarding the propriety of the sanction, the sanction of being muted is relatively minor and directly tailored to curb counsel's conduct. We discern no violation of WLA's right to be heard.

## VI. CONCLUSION

For the reasons stated, we conclude that WLA's failure to redeem the property subject to foreclosure rendered the majority of this appeal moot. We conclude that it was not error for the trial court to allow a credit bid, or partial credit bid, during the foreclosure sale. However, we conclude that the trial court should have determined the amount of the lien underlying the credit bid. This is necessary to determine what, if any, surplus resulted from the foreclosure sale. We remand for the trial court to make findings and conclusions regarding the amount of the lien underlying K2's credit bid. To accomplish this, the trial court has the discretion to rely on the existing record, or supplement the record to the degree it finds necessary to determine whether a surplus resulted from the foreclosure sale. We do not retain jurisdiction.

/s/ Noah P. Hood
/s/ Michael J. Riordan
/s/ Michelle M. Rick

-20-